**Anthony SOUZA et al.**

v.

**Anthony P. TRAVISONO, Individually and as Director, Department of Corrections, et al.**

**Civ. A. No. 5261.**

United States District Court, D. Rhode Island.

Dec. 18, 1973.

Ralph J. Gonnella and Thomas C. Angelone, Richard A. Boren, Inmate .Legal Assistance Program, Providence, R. I., Max Stern, Burnham, Stern & Shapiro, Boston, Mass., Stanley A. Bass, New York City, John M. Roney, R. I. Legal Services, Providence, R. I., for plaintiffs.

W. Slater Allen, Jr., Donald P. Ryan, Edward F. Burke, Providence, R. I., Joel D. Landry, R. I. Dept. of Corrections, Cranston, R. I., Raymond R. Coia, Everett A. Petronio, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This is a class action filed on behalf of the inmates confined at the Adult Correctional Institutions (hereinafter cited as ACI) against various state officials and correctional officers seeking declaratory and injunctive relief against certain policies and practices of the defendants alleged to be unconstitutional. Specifically, plaintiff inmates allege they have been denied the right of access to counsel and the right to attorney-client confidential communication in violation of the First, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. The cause of action arises under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202. Jurisdiction is based on 28 U.S.C. § 1343.

### *Findings of Fact*

#### Attorney and Law Student Access to Inmates

The evidence offered at the hearing on July 27, 1973 on the preliminary injunction, at the conclusion of which an order was entered with the consent and by agreement of all the parties and the October 28, 29, 1973 hearing on the merits, constitute the facts of the case.[1] It establishes, and I so find, the facts to be as recited hereinafter.

In November of 1971, an Inmate Legal Assistance Program (hereinafter referred to as "ILAP") was instituted at the Adult Correctional Institutions. This program is federally funded through a grant from the Law Enforcement Assistance Administration pursuant to the Federal Omnibus Crime Control and Safe Streets Act of 1968, and is designed to provide a full panoply of legal services to indigent prisoners. These include but are not limited to actions of divorce, bankruptcy, probate, bail, detainers, civil rights, post-conviction remedies and a miscellany of prisoner problems. Additionally, the "ILAP" often performs the important function of acting as a liaison with the Public Defender Service in relation to a prisoner's defense in a criminal action. In Rhode Island, it functions under the auspices of the Rhode Island Governor's Committee on Crime, Delinquency and Criminal Administration and is administered pursuant to a sub-grant by the Center for Corrections and the Law at Boston College Law School.

The present "ILAP" sub-grant budgets rental space for three rooms totaling

---

1. The defendants appealed the order granting preliminary injunction seeking a stay of the trial on the merits pending appeal. This Court, at the time of the preliminary hearing, specifically reserved decision of the following issues raised by the parties:
 (a) whether or not agents and experts in the service of attorneys have the right to enjoy the same privileges as attorneys (access to prison to consult with inmates);
 (b) whether or not the consultation facilities afford appropriate confidentiality;
 (c) whether the room to be provided to attorneys will be adequate for appropriate consultation by attorney and client. (This room has since been constructed and is a subject of the present controversy);

(d) whether or not the Inmate Legal Assistance Program ("ILAP") is entitled to the use of an office in the administration section of the Maximum Security Building.
 The Court of Appeals by Memorandum and Order entered on October 26, 1973 denied the defendants' motion while retaining jurisdiction over the appeal stating, *inter alia*:
 "Moreover, because trial. is scheduled to commence within two weeks, and because the issues not dealt with in the preliminary injunction are intimately tied to issues which come within the ambit of the injunction, we think it reasonable that the district court should proceed to decide the merits of all the claims."

500 square feet " . . . to be supplied in-kind by the ACI"[2] and from inception of the program, office space at the ACI was furnished and occupied in the administration wing of the Maximum Security Section.

The "ILAP" permanent personnel consists of a supervising attorney, a staff attorney and an office manager who in turn have the assistance of law students from Boston College Law School. From September, 1972 to June 15, 1973, fifteen such individuals worked on a part-time basis in return for which they received course credits. However, during the summer months, three to four students worked for salary on a full time five day a week schedule. The scope of their activities was limited to assisting the two program attorneys in determining the eligibility of inmate applicants for legal assistance and if the case was accepted, preparing the historical aspects and researching the applicable law.

Since the defendants attack in opposition to the plaintiffs' complaint is aimed directly at the activities of these students, the Court carefully searched the record and found that the sum and substance of the law student assistance may be recited in seriatim form.

1. Applications for assistance are received either directly by mail, phone calls or letters from the inmates, or their family, friends, other attorneys and on occasion even correctional officers.

2. The initial step of determining the indigency of the applicant was done by the law student after a personal interview with the prisoner.

3. If the inmate qualified for "ILAP" assistance, the student then embarked on a full factual investigation which in certain cases required that he travel to different court houses to search files, or to other states if detainer questions had to be resolved.

4. The final preparatory step was the crystallizing of the legal issues and completing the necessary research to be embodied in a report to the staff attorneys; conferences were held with them as to the legal merits of the case and the action, if any, to be taken. Though indeed they participated in the decisional process at no time did they give their own independent legal advice or conclusions to a client.

Prior to June 23, 1973, the "ILAP" operated in this manner with few restrictions on the law students, who were allowed to visit inmates at all reasonable day and night hours.

A tragic and devastating prison riot occurred on April 2, 1973 and thereafter the murder of a guard on June 22, 1973.[3] In the interim, the present Warden was appointed, i. e. on May 7, 1973. As a result of his policies, the "ILAP" was evicted from the office space it occupied, law students were barred from the institution and the access of the staff attorneys curtailed as evidenced by the following series of events:

"July 3, 1973—the two 'ILAP' attorneys went to the prison with five to ten files each to see their clients but were denied access because they were not 'attorneys of record.' " (Testimony of Richard Boren).

It appears to this Court that their status as attorneys of record could not be readily established because of the manner in which the applications were received, i. e. a phone call, letter or message of some sort from a third party to

---

2. This is set forth in plaintiffs' exhibit 1 at pages 9 and 11. Note this is an amended sub-grant increasing both the amount and duration of the original sub-grant. For the purposes of this case this need not be further explained or detailed.

3. Though these dates are not specifically in the record, the notoriety of the events and the inferences from the testimony justify this statement by the Court.

see the inmate or that the case had not reached the maturation point of court action. Preciseness is lacking as to the exact meaning of "attorney of record" but it is evident the "ILAP" law students are simply not allowed under any conditions to see inmates, who in one way or another contacted "ILAP" for help. As a result of this incident, the supervising "ILAP" attorney met with the Director of Corrections and also wrote to the Governor's Crime Commission. It was a sterile effort, for on July 12, 1973, the same obstacle was encountered. Four of the law students were denied admission.

At or about this time, the staff attorney learned that the Warden had issued a directive which he had not received and subsequently was unable to get in spite of two requests to the Attorney General of the State.[4]

On July 13, 1973 the staff attorney was at first denied admission to see an inmate because he was not an attorney of record. After explaining he was requested to see the prisoner by another attorney because of the prisoner's many problems, he was told that only the Warden could grant him access. He then attempted to speak to the Warden who was only ten feet away but who refused

---

4. "State of Rhode Island and Providence Plantations
Department of Corrections

Anthony P. Travisono Adult Correctional Institutions
Director P.O. Box 8273
 Cranston, Rhode Island 02920
 463-7900

September 27, 1973

Mr. Richard A. Boren, Esq.
Inmate Legal Assistance Program
Box 892, Annex Station
Providence, RI 02901

Dear Mr. Boren:

This is to acknowledge your letter of September 19, 1973 relative to your request for admission of 10 law students to the Adult Correctional Institution for purposes of interviewing inmates.

Your letter has been forwarded to Warden, James Mullen, and his position at this time is that he cannot admit the named individuals to the institution for the purpose requested. It is noted that all of the students are out of state residents, that they have not been approved by the Supreme Court by the State of Rhode Island to practice law or assist in the practice of law and as such are not governed by the rules of discipline. In addition, Souza vs. Travisono, C.A. No. 5261, is a pending case, a portion of which is under appeal, and the question of student interns visiting inmates as presented in that action has not been resolved by the court; in fact, that question has been specifically reserved by Chief Judge Pettine.

Warden Mullen's position concerning visits to inmates at the present time is further guided by the facts of; limitation of space for visiting, limitation of space for attorneys to consult with their clients as well as a shortage of manpower to maintain security within the institution.

In view of the foregoing, I have been advised to inform you that it is not possible at this time to admit to the institution the named individuals as contained in your letter of September 19.

Very truly yours,

Joel D. Landry /s

Joel D. Landry, Esq.
Assistant Legal Counsel"

JDL/lc

to talk with the attorney except to tell him to see the guard. Following this shuffling, he was allowed in.

On July 23, 1973, the staff attorney again encountered difficulty in seeing a prisoner referred to him by another attorney. The situation was explained to the guard who then called another officer who appeared 25 minutes later. After gaining admission, the guard inquired about the contents of the attorney's legal folder and started leafing through the papers contending he was looking for contraband. The attorney grabbed the file and offered to lift each sheet separately. The guard refused, insisting on going through them personally. The staff attorney feeling the attorney-client privilege was being violated left.

The present policies at the ACI appear to be in part a reflection of the Warden's attitude toward the nature of the "ILAP," involving the extensive use of law students serving as para-legal assistants to the staff attorneys.

Baldly he testified, "It's my testimony they don't belong in the prison" and merely offered as justification the bromide that they posed a threat to prison security. This conclusion is not substantiated in the record. On the contrary, the Warden's attitude shows a callous indifference, for at no time did he investigate the qualifications or reputation of participating students. In fact he didn't even know they were students nor did he bother to familiarize himself with the workings of the "ILAP." Even conceding that there was too much traffic "within the walls," as the Warden described, and that he could not continue to permit 85 people representing various civic projects free access to the Institution because it was "undermining" the staff and affecting control of the prison population, he failed to note that at no one time was there ever more than four law students "within the walls" nor did he distinguish the "ILAP" from other

"volunteer" groups in that their mission was one designed to provide inmates effective access to the courts. As to any disruptive results stemming from these activities not even a modicum of supporting evidence was offered. All we have is the Warden's uttered predilection that he would rather have the inmates see their families rather than law students. In short it is evident the Warden feels no affirmative burden to provide inmates or their attorneys with services of law students and to the date of the trial on the merits remained inflexible in this regard.

Conceding that the Warden has an unquestioned right to take a strong summary stand to control an unruly prison population and forestall a planned kidnapping of civilians by the prisoners which he stated as one of his concerns based on information he had received and further that the questioned order was promulgated during a tense and trying time, the fact remains there has been no change of policy or attitude despite the restoration of order and re-establishment of normal prison routine. Though he denies being influenced by the guard personnel, the Director of the Department of Corrections did state the employees at the Institution threatened a "job action" strike if the "ILAP" was permitted to return to its offices.

### Consultation Facilities

During the hearing on the plaintiffs' motion for preliminary injunction, the Court was advised that there was being constructed at the Institution an attorney's consultation room. Whether or not these facilities, now completed, afford appropriate confidentiality is before me for determination.

The presently existing attorney's consultation room is a small room off a so-called conference room and is in the shape of an inverted "L." It is best described with minimum verbiage by the following diagram:

This is a closed area with a glass panelled door which can, in somewhat crowded fashion, accommodate four people. This is the only private room in the entire prison allowed for use by attorneys for client interviews. Adjoining this room is a large conference room approximately fifteen feet by twenty feet which is used jointly by attorneys and social workers. It has several tables and chairs, a telephone and serves additionally as the passage way through which inmates must travel from the cell block area to reach the "general" visiting room.

An attorney with a considerable criminal practice testified he has never used the private room but has conferred with clients in the conference room which, though not ideal, is adequate. However, if retained in a serious case, he interviewed his client at night.

There are a number of other rooms which this Court viewed in the barbershop area. These are either vacant or subject to flexible use and would afford excellent facilities for confidentiality of attorney and client and observation by correctional officers. However, these are located in the "heart" of the prison and are not easily insulated against the general prison population.

### Conclusions of Law

Beginning with Ex parte Hull, 312 U. S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), an inmate's due process right of access to the courts has been undisputed. Case law throughout the country supports this legal postulate [5] and it would only be an exercise in supererogation to further articulate this point other than to quote from Gilmore v. Lynch, 319 F. Supp. 105, 109 (N.D.Cal.1970) aff'd sub nom. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) wherein the district court held:

> "Reasonable access to the courts is a constitutional imperative which has

5. See Coleman v. Peyton, 362 F.2d 905, 907 (4th Cir. 1966):
". . . a right of access to the courts is one of the rights a prisoner clearly retains. It is a precious right, and its administratively unfettered exercise may be of incalculable importance in the protection of rights even more precious."

been held to prevail against a variety of state interests. Similarly, the right under the equal protection clause of the indigent and uneducated prisoner to the tools necessary to receive adequate hearing in the courts has received special reenforcement by the federal courts in recent decades. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Griffin v. Illinois, 351 U.S. 12, 76 S. Ct. 585, 100 L.Ed. 891 (1956); Richards v. Townsend, 303 F.Supp. 793 (D.C.1969)."

This Court has previously recognized such a right:

> "The Constitution protects an inmate's right of access to the courts and his corollary right to obtain legal assistance. Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970). A custodian may not impair the access to the courts of one committed to his custody, whatever the nature of the legal proceedings involved. Cross v. Powers, 328 F.Supp. 899 (D.Wis.1971)."

Gomes v. Travisono, 353 F.Supp. 457, 469 (D.R.I.1972).

 This requirement of access to the courts is not dependent on the type of legal matter involved and while it is strongest where criminal matters, Argersinger v. Hamlin, 407 U.S. 25, 92 S. Ct. 2006, 32 L.Ed.2d 530 (1972), and habeas corpus are concerned, see Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L. Ed. 1034 (1941), it also extends to civil rights actions, see Nolan v. Scafati, supra, and indeed may extend to all civil actions, see Cross v. Powers, supra. Indeed the Supreme Court has recognized

that a state not only must refrain from physical interference with an inmate's right of access to the courts,[6] but also has an affirmative obligation to provide inmates with some form of effective assistance in the preparation of their legal cases.[7] This is in keeping with the teaching of the First Circuit Court of Appeals in Nolan v. Scafati, 430 F.2d 548, 551 (1970).

> "Johnson v. Avery clearly stands for the general proposition that an inmate's right of access to the court involves a corollary right to obtain some assistance in preparing his communication with the court. Given that corollary right, we fail to see how a state, at least in the absence of some countervailing interest not here appearing, can prevent an inmate from seeking legal assistance from bona fide attorneys working in an organization such as the Civil Liberties Union. Accord: Burns v. Swenson, 300 F. Supp. [759] at 761–762; see McCloskey v. State of Maryland, 337 F. 2d 72, 74–75 (4th Cir. 1964); see also Sostre v. Rockefeller, supra [312 F. Supp. 863 (D.C.)]; Hymes v. Dickson, 232 F.Supp. 796 (N.D.Cal.1964)."

See Cross v. Powers, supra. Although a state has some latitude in the manner in which it insures such assistance, a district court is under an obligation to test a state's efforts to meet the standards set down in Johnson v. Avery to determine if they insure effective access to the courts. See Novak v. Beto, 453 F.2d 661 (5th Cir. 1971).

With this background the Court will now consider the status of the law student assistants in the context of the Sixth and Fourteenth Amendments to the Constitution of the United States.

---

6. In Nolan v. Scafati, supra, a prisoner's letter to the Civil Liberties Union could not be seized by prison officials. Cf. Smith v. Robbins, 454 F.2d 696 (1st Cir. 1972).

7. "Accordingly, the initial burden of presenting a claim to post-conviction relief usually rests upon the indigent prisoner himself with such help as he can obtain within the prison walls or the prison system. In the case of all except those who are able to help themselves—usually a few old hands or exceptionally gifted prisoners—the prisoner is, in effect, denied access to the courts unless such help is available." Johnson v. Avery, 393 U.S. 483, 488, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969).

## A. *Law Student Assistants*

■ Since a corollary right to the right of reasonable and effective access to the courts is the right of some form of legal assistance to inmates, and since this Court finds that the "ILAP" is presently essential for the purposes of providing such assistance, the state may not condition its operations in such a way that the inmates' right of access to the courts is effectively impaired.

The question now before the Court is whether the summary barring of paralegal personnel, i. e. law students as assistants to qualified attorneys rendering general legal services to inmates including enforcement of constitutional and civil rights, does in effect impair this right of access to the courts.

■ To be something more than a mere shibboleth, the right of access to the courts must mean access to qualitatively competent legal assistance, reasonably available and capable of responding to the legal needs of the inmate population.

■ A penumbra incident thereto which is necessary to effectuate its meaning must include the right of a prisoner to consult with his attorney's agent.

In the context of this case, Richard Boren, supervising attorney for "ILAP," stated that during the course of his service they have given assistance to 60–70% of the entire inmate population and that at any given time could be representing anywhere from one-fifth to one-third of all the inmates which means handling seventy to one hundred and fifty files. He further testified, "without the investigators (students) I doubt whether the program could function at all." [8]

Consequently, in light of this testimony there can be no doubt that the use of law students as agents for "ILAP" attorneys is essential if an inmate is to re-

---

8. The use of law students to aid in the legal assistance of inmates has indeed been recognized as sound:

> "Use of law students to counsel and advise with prisoners, commended by the A.B.A. report, may well provide the key toward serving a need without excessive drain on community resources. Thus far none of the area law schools has any such program, though one has a program to provide legal assistance to inmates on their civil problems.
>
> The law schools of the country have found that counseling of prison inmates has not only achieved objectives in terms of improvement of administration of justice, but has given the students, who show strong motivation, 'an extraordinary learning experience.' So wrote Professor Paul Wilson, an experienced trial lawyer who served as the faculty advisor of the first of these projects, wherein students at the University of Kansas Law School, under supervision, interview and counsel the inmates of Leavenworth Penitentiary. When Yale Law School recently began to provide aid to inmates of the Federal institution at Danbury, it became the 12th law school providing such assistance to prisoners at Federal institutions.
>
> Another eight law schools are listed as providing service to inmates of State institutions, including the Harvard Legal Assistance project, established by the Center for Criminal Justice at Harvard, which is combining legal assistance with research into the range of prisoners' legal problems.
>
> There are of course problems with these as with any other human program. There is need for assuring effective supervision of the students. There may be a conflict between the service and educational purposes of the program. Large penal institutions exhaust the capacity of the school that happens to be nearby.
>
> Yet there are indications that such law student programs present a means, at modest cost, of furthering objectives of criminal justice. This includes indications that such programs do cut down the number of frivolous applications. They may also lead to the uncovering of more meritorious petitions. Both trends are in the furtherance of our system of justice. And law school students can take on other aspects of counseling of inmates, beyond the scope of this opinion, which have been remarked as an overall contribution to the administration of justice."

United States v. Simpson, 141 U.S.App.D.C. 8, 436 F.2d 162, 169–170 (1970). See also Johnson v. Avery, 393 U.S. at 491–498, 89 S.Ct. 747, 21 L.Ed.2d 718 (Douglas, J., concurring).

ceive his constitutional right to reasonable and effective access to the courts.

Given the solicitous rationale of Johnson v. Avery, *supra,* it has not been difficult for courts to conclude that the right of a prisoner to consult with his attorney's agent, may take on constitutional dimensions and that prison rules affecting this right "must pass the basic due process test of reasonability." Martinez v. Procunier, 354 F.Supp. 1092 (N.D.Cal.1973), prob. juris. noted, 412 U.S. 948, 93 S.Ct. 3013, 37 L.Ed.2d 1000 (1973). This case struck down a regulation limiting investigators' access to prisoners only to those who were licensed. The court stated:

"If attorneys of record must interview their clients personally at the many CDC institutions, the time spent travelling would necessarily prohibit them from spending as much time working on legal problems.

Conversely, if attorneys can send assistants with detailed instructions to interview inmates, they will have more time available to evaluate the contentions raised and prepare the necessary legal documents. It follows that each inmate-client will receive better legal assistance, thus facilitating his access to the courts. Moreover, attorneys would have more time to serve additional clients who might otherwise have to rely on jailhouse lawyers.

The potential benefits to inmates, attorneys and the courts from permitting attorneys to send law students or other para-professionals throughout the profession is becoming recognized as a means of improving legal services. The American Bar Association

for example, recognizes such procedure in its new Code of Professional Responsibility."

*Id.* at 1098. See also Clifton v. Superior Court, 7 Cal.App.3d 245, 86 Cal. Rptr. 612 (1970).

■ However, it is clear that the right of an inmate to see his attorney or the attorney's agent in the exercise of a right of access to the courts is subject to a reasonable spectrum of prison controls that can range from the primary need of prison security and discipline to the maintenance of such housekeeping rules as lunch schedules. See Konigsberg v. Ciccone, 285 F.Supp. 585, 597 (W.D.Mo.1968), aff'd 417 F.2d 161 (8th Cir. 1969), cert. denied, 397 U.S. 963, 90 S.Ct. 996, 25 L.Ed.2d 255 (1970). These regulations must be reasonable and in no way impair the right itself. As the court stated in Via v. Cliff, 470 F.2d 271, 274–275 (3rd Cir. 1972):

" . . . the authority of prison officials to 'regulate' the exercise of the right should not be employed to wrongfully interfere with the exercise of the right."

Such regulations "must pass the basic due process test of reasonability, with the test being more or less stringent according to the character of the right taken from the prisoner." Gilmore v. Lynch, 319 F.Supp. at 109, n. 6.[9] The extent of due process safeguards must be measured as outlined by Chief Judge Coffin in his superb opinion in Palmigiano v. Baxter, 1973, 487 F.2d 1280 (1st Cir. 1973).

It is a two level analysis which first necessitates deciding if due process is required at all and if yes, the amount necessitated under the "precise" circum-

---

9. In *Gilmore, supra,* the court also states: "In most cases, however, the basic test remains the same: the asserted interest of the State in enforcing its rule is balanced against the claimed right of the prisoner and the degree to which it has been infringed by the challenged rule. Most prison regulations reflect the clear exigencies of a penal situation and the courts are justifiably reluctant to question their wisdom. Austin v. Harris, 226 F.Supp. 304 (D.C.1964). Other rules, though, touch upon interests of which the judiciary is more solicitous, and the burden of justifying these regulations is especially heavy, comparable to the 'overwhelming state interest' required by Shapiro v. Thompson, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969)." *Id.* 319 F.Supp. at 109.

stances. "The first determination depends upon an assessment of the inmate's stake in the decision, rather than upon a weighing of the inmate's interest against the interests of the state. . . . The stake will be sufficiently large to necessitate some due process of [sic] the consequences of the challenged actions of the state officials are sufficiently serious to amount to a 'grievous loss'." *Id.* at 1284–1285 (citations omitted).

The court further held that limitations upon due process rights may not be upheld simply by a finding that the limitations are rationally related to a legitimate state goal. The court noted:

"The government's obligation here is fundamentally the same as that underlying its obligation to use 'less drastic means' when infringing upon First Amendment rights, see United States v. Robel, 389 U.S. 258, 267, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), or its obligation to use the 'least restrictive alternative' when impinging up [sic] travel, free flow of commerce, or property rights, see Aptheker v. Secretary of State, 378 U.S. 500, 507, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Polar Ice Cream and Creamery Co. v. Andrews, 375 U.S. 361, 375 n. 9, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964); Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 95 L.Ed. 329 (1951); see also Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). When the government has 'reasonable and adequate alternatives available' to a given end, it must choose the measure which least interferes with individual liberties. Dean Milk Co. v. City of Madison, *supra,* 340 U.S. at 354, 71 S.Ct. 295."

*Id.* at 1287–1288.

The issue presented to this Court is whether or not the total bar against such students that has taken place at the ACI denies the inmate client the effective access to the courts to which he is entitled. I conclude it does.

It appears to me that a minimal level of due process is reached and that the stakes are indeed high when an inmate's right to access to the courts is subject to inordinate delay or minimum consultations with his attorney. In light of the evidence in this case this result is a certainty.

One can hardly conceive of a more egregious situation than unreasonable delay in release from illegal incarceration due to inaccessibility of counsel or his agent. So too the loss of a legal remedy for failure to serve process at the propitious moment presents a serious deprivation which cannot be justified on the misplaced reasoning that eventually the inmate will be given an opportunity at sometime to see his lawyer. With only two staff attorneys attempting to service up to 150 inmates at a single point in time in a controlled prison setting it is inevitable that access to courts will become so enervated as to result in serious constitutional loss as to some prisoners.

The quantum of due process loss is serious. This must be weighed against the countervailing interest of the government [10] that prison security and discipline are jeopardized by the admis-

10. "Once it has been determined that the inmate's stake in the decision is sufficient to require a minimal level of due process safeguards, the second task facing the court, more difficult and more subtle, is to decide how such due process is required beyond this minimal level. '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by governmental action.' Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). After the precise interests of the inmate and the state have been identified, the two interests are weighed one against the other." (citations omitted).
Palmigiano v. Baxter, *supra,* at 1284–1285.

sion of these students; and that barring them is encompassed in the state's power to restrict the practice of law.

The short answer to the latter point is found in Johnson v. Avery, *supra.*

"In reversing the District Court, the Court of Appeals relied on the power of the State to restrict the practice of law to licensed attorneys as a source of authority for the prison regulation. The power of the State to control the practice of law cannot be exercised so as to abrogate federally protected rights. NAACP v. Button, 371 U.S. 415 [83 S.Ct. 328, 9 L.Ed.2d 405] (1963); Sperry v. Florida, 373 U.S. 379 [83 S.Ct. 1322, 10 L.Ed.2d 428] (1963)."

393 U.S. at 490, n. 11, 89 S.Ct. at 751.

See also Wainwright v. Coonts, 409 F.2d 1337 (5th Cir. 1969).

Focusing on the defendants' testimony it fails far short of supporting their position as to prison security. Not even a scintilla of evidence was offered supporting the position that student presence which never exceeded four at any one time in any way jeopardized security nor does the fact that they might be taken as hostages hold water. As argued by the plaintiffs this fear should have included "attorneys, priests, tutors and classification officers as well" and in the ultimate exercise of such logic even destroy the fundamental constitutional right of a criminal defendant to counsel in the preparation of his defense by barring defense attorneys themselves.

The interest the defendants urge, conflicts with their own conduct in that they have established a perfectly safe area for attorneys and their agents to see prisoners—the present attorney's room and the adjacent conference room. The Warden designated this area as suitable for attorneys to interview their clients. This, by his own admission, accomplishes his "goal of efficient custody" and no reason has been set forth or is apparent why this same facility can't be used by law students. Indeed it is adjacent to a large room used for general visitation by prisoners' families and friends. There is simply no evidence that access to this part of the prison will in any way jeopardize security.

While the major issues the Court is asked to decide in the instant case most directly involve the due process right of an inmate to the effective access to courts, I am not unmindful that many of the persons housed at the ACI are either awaiting trial or are otherwise represented by attorneys in proceedings to which attaches the fundamental right to counsel, as enunciated in the Sixth Amendment. See Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Johnson v. Zerbst, 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938); Grossjean v. American Press Co., 297 U.S. 233, 243–244, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Clearly in those situations, any regulation which dilutes the fundamental right to counsel can never be condoned, except under the narrow circumstances which amount to a compelling and overwhelming state interest. See Gilmore v. Lynch, *supra,* 319 F.Supp., at 109, citing Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). See also Via v. Cliff, *supra;* Clifton v. Superior Court, *supra.* In circumstances in which a prisoner's Sixth Amendment right to counsel is involved, not only must an attorney be given the broadest possible opportunity to meet and confer with his inmate client but the same right as of necessity filters down to his para-legal assistants. And the right to select such assistant rests with the attorney and not the prison officials. If this were not so it could seriously impair the inmate's Sixth Amendment right. It follows therefore, in such situations, the same compelling interest test must apply to such assistants. Gilmore v. Lynch, *supra.* The situation is no different in applying the balancing test in due process cases. The alter ego sta-

tus of para-professionals parallels that of the principal whether it be in the exercise of due process access to the courts or the fundamental right to counsel.

### B. *Attorneys of Record*

There remains the question whether such access is only for "attorneys of record" as is now in force by virtue of the Warden's order. The answer is no.

■ This Court recognizes that no attorney can have free and unfettered access to any and all prisoners as he chooses. Such freewheeling could conceivably disrupt prison discipline and present security problems. However, applying the "Palmigiano" test and rationale articulated by this opinion, it follows an attorney need not be formally retained by the inmate but rather must be given access to a prisoner in any and all situations serving a legitimate legal or legally related interest at issue which may either directly or indirectly involve that inmate. And any regulation of that access must be governed by the test appropriate to the interest being served.

For example, a legitimate interest may be created by a request by a family member, friend, or even anonymous person to an attorney that he see an inmate because such prisoner has so requested or needs help. Likewise the prisoner himself may request to see an attorney other than the one of record. This can readily be understood in the context of post conviction relief premised on the incompetency of the inmate's former lawyer or simply to change attorneys as is the right of any client.[11] Another situation may be to see the inmate as a potential witness or as one who has or may have information or knowledge as to a matter at issue. These may require the due process "Palmigiano" test in determining when and how access is to be granted. On the other hand an inmate requesting counsel to defend him in a criminal case requires application of the more stringent compelling interest standard. These examples are not intended as all inclusive and may require a case by case consideration. I merely recite them to point out the varied legitimate reasons which can give rise to the rights articulated in this opinion.

### C. *Consultation Facilities*

It cannot be disputed that an inmate has the right of private consultation with his attorney. In Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970) this Court stated:

"I cannot accept the rationale of the various court decisions such as United States ex rel. Vraniak v. Randolph, 161 F.Supp. 553 (E.D.Ill. and Green v. Maine, 113 F.Supp. 253 (D.Me.1953) upholding the censoring of mail between prisoners and attorneys. . . .

I find that contact with an attorney, and the right to consult privately, is vital to an inmate's access to the courts."

*Id.* at 789 citing In re Rider, 50 Cal. App. 797, 195 P. 965; Burns v. Swenson, 300 F.Supp. 759 (W.D.Mo.1969).

■ Such right of privacy is vital to due process to guarantee the effective assistance of counsel.[12]

■ I find that facilities exist at the Adult Correctional Institutions which do afford the required attorney-client confidentiality. The "attorney's" room can accommodate four people in total privacy. This is of sufficient size for most single cases. However, conflicts can arise when more than one attorney seeks a private consultation. In such instances the attorney's options are

11. See South Carolina Department of Corrections, The Emerging Rights of the Confined (1972).

12. See Coplon v. United States, 89 U.S.App. D.C. 103, 191 F.2d 749 (1950) cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952); Via v. Cliff, 470 F.2d 271 (3rd Cir. 1972); Smith v. Robbins, 328 F.Supp. 162 (D.Me.1971) aff'd, 454 F.2d 696 (1st Cir. 1972); Parker v. United States, 358 F.2d 50 (7th Cir. 1965) cert. denied, 386 U.S. 916, 87 S.Ct. 872, 17 L.Ed.2d 788 (1967); Marsh v. Moore, 325 F.Supp. 392 (D.Mass. 1971).

to wait out the availability of the attorney's room, conduct the interview in the adjoining conference room at the sacrifice of privacy, or attempt to see the inmate at some other time. In light of the prison population, which I note approximates 380, and the caseload of the "ILAP" attorneys, these facilities are of such limited capacity as to infringe on the inmate's constitutional right to counsel and court access. The Court viewed these rooms and acknowledging it has no expertise in construction and was not assisted by testimony, it does appear to a layman's eye that minimal modification of the conference room can convert it into a most satisfactory accommodation for attorney-client conferences. If the Court might suggest as a guide, consideration be given to modifying the existing rooms by erecting two or three open ended "bank loan" type booths, and a three-quarter partition to form a corridor from the cell block door to the general visiting room. It is ordered a plan, in keeping with the Court's suggestion or in the alternative any other reasonably similar plan, be submitted to the Court within two weeks of the date of this decision.

### D. "ILAP" Office Space at the ACI

Plaintiffs claim that the summary ouster of the "ILAP" from the office space it occupied at the ACI served to deny them effective access to the courts and furthermore, that in so acting the defendants violated the terms of the sub-grant through which the "ILAP" receives federal funds.

Since plaintiffs' "contract" claim may be dispositive of this issue, the Court refrains from deciding the constitutional argument raised in this regard.[13] However, the only evidence on the record as to this issue is an "application" for a continuation of sub-grant No. 72–9902A and not the sub-grant itself. It is stated in that application that rental space

of three rooms totalling 500 square feet of space @ $3.50 per foot for twelve months (total value $1,750.00) was to be supplied "in kind" by the ACI. However, under paragraph 15 entitled "Applicant's Agreement," it is stated in sub-paragraph (h):

> "Any grant awarded pursuant to this application may be terminated in whole or in part by the Governor's Committee on Crime, Delinquency and Criminal Administration or its designee at any time."

It is unclear from the record whether such a stipulation appears as part of the terms of the sub-grant itself and, if so, whether the defendants acted pursuant to this provision in ousting the "ILAP" from its "in house" office space.

Since further evidence must be adduced, the Court reserves decision on this issue pending an evidentiary hearing to be held after the issuance of this Opinion.

The plaintiffs will prepare an order in keeping with this Opinion.

---

13. Whether an "in-house" legal assistance project for inmates rises to the level of a constitutional imperative may depend on whether a state has otherwise provided a

plan for the delivery of inmate legal services which insures that the right of inmates to reasonable and effective access to the courts is secure. See Johnson v. Avery, *supra.*