76 P.3d 578

**In the Interest of DOE CHILDREN: Jane Doe, Born on January 10, 1990, John Doe, Born on February 4, 1991, and Jane Doe, Born on December 13, 1992, Minors.**

No. 24716.

Intermediate Court of Appeals of Hawai'i.

June 6, 2003.

Joseph Dubiel, for Father–Appellant.

David McCormick and Mary Anne Magnier, Deputy Attorneys General, for Department of Human Services–Appellee.

Dean T. Nagamine, Guardian Ad Litem, for the Children.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by BURNS, C.J.

The father (Father) of Jane Doe, born on January 10, 1990, John Doe, born on February 4, 1991, and Jane Doe, born on December 13, 1992 (collectively, "the Children"), appeals from the family court's (1) Order Awarding Permanent Custody entered on November 6, 2001, and (2) order filed on November 16, 2001, denying Father's motion for reconsideration. We affirm.

At the time of the trial that led to the November 6, 2001 Order Awarding Permanent Custody, Father was in the legal custody of the State of Hawai'i's Department of Public Safety (DPS), *see* Hawai'i Revised Statutes (HRS) Chapter 353 (Supp.2002), but physically at the Florence Correctional Center in Florence, Arizona.

Specifically, Father is challenging Judge Linda K.C. Luke's October 8, 2001 order continuing Father's September 27, 2001 Amended Motion to Return Father for Pre-Trial and Trial, and Judge Marilyn Carlsmith's October 26, 2001 order denying Father's motion to have Father brought back to Hawai'i from Arizona for the trial.

Father's sole point on appeal is that

THE FAMILY COURT ERRED BY REFUSING TO RETURN FATHER FOR THE PERMANENT CUSTODY TRIAL AND FATHER WAS DENIED HIS RIGHTS OF DUE PROCESS OF LAW AND TO BE PRESENT AT THE TRIAL AND DENIED THE RIGHT TO CONFRONT THE WITNESSES AGAINST HIM AND TO BE ABLE TO ASSIST HIS ATTORNEY IN HIS TRIAL.

We conclude that Father's challenge is without merit.

## BACKGROUND

On November 2, 1993, Appellee Department of Human Services, State of Hawai'i (DHS), petitioned, under HRS Chapter 587 (1993), for temporary foster custody of the Children. On November 15, 1993, the petition was granted.

On January 6, 1994, Judge Bode A. Uale noted that Father was in prison and ordered the December 2, 1993 Service Plan and

Agreement into effect. This plan noted, in relevant part, that the Children

were at risk for threatened abuse and neglect following a car accident in Waianae. [Mother] tested positive for cocaine and alcohol at Queen's Medical Center following the accident. [Father] and [Mother] have a history of domestic violence and substance abuse that contributed to the accident and putting their children at risk.

This plan required Father to participate in (a) an anger management program, (b) weekly Alcoholic's Anonymous meetings, (c) a drug treatment program, and (d) a psychological evaluation.

On June 17, 1994, Judge Rodney K.F. Ching ordered the June 2, 1994 Service Plan and Agreement into effect. Regarding Father, this plan was essentially the same as the December 2, 1993 Service Plan and Agreement.

On November 29, 1994, Judge Uale ordered the Service Plan and Agreement, dated November 14, 1994, into effect. Regarding Father, this plan noted that he "is currently incarcerated at Waiawa Correctional Facility and is in the process of moving to the Oahu Correctional Facility's Laumaka Furlough program."

On May 31, 1995, Judge Luke entered an order revoking family supervision and terminating the family court's jurisdiction.

On June 27, 1997, the DHS filed a Petition for Family Supervision. Thereafter, the court appointed counsel for Father and Mother and appointed a Guardian Ad Litem (GAL) for the Children.

On August 28, 1997, Judge Uale ordered Service Plan # 1 into effect. This plan noted that "[Father] is incarcerated at Halawa prison and his need for further treatment has not yet been identified."

On March 20, 1998, Judge Paul T. Murakami ordered Service Plan # 2 into effect. This plan noted that "[Father] has had drug problems in the past and further assessment is needed to identify his current need for services. He was recently arrested for injuring a women [sic] during a shooting." On April 27, 1998, Judge Uale ordered the continuation of Service Plan # 2. An exhibit

noted that "[Father] recently got into domestic argument [with] wife [and] unable to cope in living environment at Victory Ohana. [Father] unable to deal [with] people at Victory Ohana [and] getting into personal conflicts. [Father] relapsed to drugs/alcohol [and] not honest [with] counselor about his relapse."

On October 27, 1998, Judge Uale ordered Service Plan # 3 into effect. This plan noted that

[Father] was incarcerated at the Halawa Correctional Center. It is unknown if he is participating in services. There has been no recent contact with [Father]. He has had drug and violence problems in the past and further assessment is needed to identify his current need for services. He was arrested for injuring a women [sic] during a shooting.

This plan ordered Father to participate in drug treatment programs, an anger management program, and a psychological evaluation.

On April 13, 1999, Judge Uale ordered Service Plan # 4 into effect. This plan ordered Father to participate in random urinalyses and a substance abuse treatment program, to abstain completely from the use or sale of illicit drugs and alcohol, and to learn and demonstrate an adequate understanding of the Children's needs. On September 28, 1999, Judge Uale ordered Service Plan # 5 into effect. Regarding Father, this plan was essentially the same as Service Plan # 4. On March 11, 2000, Judge Uale ordered Service Plan # 6 into effect. Regarding Father, this plan was essentially the same as Service Plan # 5.

On May 24, 2000, Father moved "for visits [by the Children] at the prison[.]" On June 6, 2000, Judge Uale granted the motion.

On September 1, 2000, Judge Carlsmith ordered Service Plan # 7 into effect. Regarding Father, this plan was essentially the same as Service Plan # 6.

On February 13, 2001, Judge Luke ordered that "DHS shall file for Permanent Custody by March 13, 2001 at [the] latest" and ordered Service Plan # 8 into effect.

Regarding Father, this plan was essentially the same as Service Plan # 7.

On July 17, 2001, DHS filed a Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan seeking

> an order revoking the existing service plan and revoking the prior award of foster custody, awarding permanent custody to an appropriate authorized agency, which permanent custody order will terminate parental and custodial duties and rights, and establishing a permanent plan relating to the above-named children, which plan will propose adoption or permanent custody for the children until subsequently adopted or the children attain the age of majority.

On September 27, 2001, Father filed an Amended Motion to Return Father for Pre–Trial and Trial. In this motion, Father noted that he "was sent to the Florence Correctional Center in Florence, Arizona, after the last hearing on July 31, 2001," and asked the family court to return him to Hawai'i for pretrial and trial proceedings. Father further noted that he "feels his Due Process rights will be violated if he is not brought back for the P.C. Trial and pre-trial[.]" On October 8, 2001, Judge Luke heard this motion and ordered, in relevant part, as follows:

1) Father's Motion to Return Father for Pre-trial and Trial is continued for further hearing with the pre-trial conference on 10/26/01 at 8[:]30.

2) Father's attorney will check with the prison to ascertain if a motion before the Circuit Court is required to have Father transported for the trial[.] [1]

3) Father shall provide, in writing, to the Court and all parties, information re-

garding his status and when he is to be released from incarceration[.]

(Footnote added.)

On October 25, 2001, Father filed his Settlement/Pre–Trial Statement, stating, in relevant part, as follows: "[Father] should be released back to Hawai'i in Jan. 2002 and he askes [sic] that this trial be posponed [sic] until the end of Jan. 2002 or Feb. 2002. Father can then show that he can provide [a] safe home."

During an October 26, 2001 pretrial hearing, Counsel for Father stated, "I understand that [Father] is supposed to be brought back in the end of January of 2002. And so I would like to postpone[.]" "[W]e should postpone this either to the end of January or the end of February." When asked by the court whether Father knew for sure when he was going to be released from prison, Counsel for Father responded, "[Father] thinks the end of January." Judge Carlsmith denied Father's motions (a) to have him brought back to Hawai'i from Arizona for the trial and (b) for a postponement of the trial.

Judge Lillian Ramirez–Uy conducted the trial on November 5, 2001. The following were present: Mother, Counsel for Mother, GAL for the Children, DHS Social Worker, counsel for DHS, and Counsel for Father. Father participated by speaker-telephone.

Father testified that his maximum term of imprisonment would be finished in June 2003, his minimum term would be finished on January 4, 2002, and he expected to have a parole hearing via "television" at the end of November 2001. When asked how long it would take for him to be able to provide a safe home for the Children if he was paroled in January 2002, Father noted that he had

---

1. In relevant part, the following was stated at the October 8, 2001 hearing:

> THE COURT: Could I ask [Counsel for Father] maybe prior to the next pretrial—I know in other courts there's a writ that's issued if someone is subpoenaed to testify. I think it's a writ of testificadum [sic] or something—
>
> . . . .
>
> THE COURT: But I think that needs to be made to a circuit judge. So those are alternatives, but what I'm gonna do is continue your motion to November 6, pending your further efforts to determine whether it's more appro-

> priate to have a writ taken to a circuit court judge to guarantee his presence to testify.
>
> [COUNSEL FOR FATHER]: Okay.
>
> THE COURT: And in the alternative—you see,—my granting your motion may be meaningless,—
>
> . . . .
>
> unless the writ is taken to bring the body back. But in the alternative, I am not inclined to continue the trial, that I think counsel should assume that the trial will occur as scheduled in the best interest of the children, but also attempting to protect parents' rights to be heard.

**338**

"been incarcerated for three and a half years[,]" and responded that he believed "nine months would be adequate."

In an Order Awarding Permanent Custody filed on November 6, 2001, the court awarded permanent custody of the Children to DHS. On November 13, 2001, Father filed a motion for reconsideration. In an order filed on November 16, 2001, the court denied this motion.

On November 26, 2001, Father filed a notice of appeal.

## FINDINGS OF FACT AND CONCLUSION OF LAW

On December 14, 2001, the court entered its Findings of Fact and Conclusions of Law (FsOF and CsOL). The FsOF state, in relevant part, as follows:

39. Father participated in trial in this matter via telephone while incarcerated in the State of Arizona for crimes committed in Hawai'i. Father was not certain, but thought that his first parole hearing was going to be in January, 2002, before the Hawai'i Parole Authority, and that he faced the possibility of being granted a parole hearing as early as mid 2002[sic].

40. Father admitted that there was no guarantee that he would be granted parole even if he was correct in stating that his Hawai'i Parole Board hearing would be in early 2002.

. . . .

43. Father appears to be stuck in a "revolving door" pattern of incarceration and release, leading the DHS and the Court to find that he is not a realistic alternative for placement of any of the three children. Should Father be released for good, he will have his hands full getting himself re-adjusted to the outside world, and would not be able to handle the difficult task of providing a safe family home for a child, let alone three children.

44. Father was not able, at the time of the trial, to provide [the Children] with a safe family home, even with the assistance of a service plan.

45. Father was not able to provide [the Children] with a safe family home, in a reasonable period of time, even with the assistance of a service plan.

COL no. 4 states as follows:

Father's argument that the lack of his physical presence in the Family Court courtroom amounted to a Constitutional due process violation lacks merit. The Trial Court gave Father's attorney ample time to attempt to coordinate a release of Father for purposes of attending his trial, but he was unable to do so. Thus, the Family Court allowed Father the fair alternative of unlimited participation by speaker-phone, which eliminated any serious due process deprivation. Father's attorney was present in the courtroom at all times, and Father himself was nearly 100% available via telephone connection from his Arizona prison.

## THE ISSUE

We note that Father does not challenge the denial of his request to postpone the trial. His sole challenge pertains to the denial of his September 27, 2001 Amended Motion to Return Father for Pre-Trial and Trial. Father contends that this alleged error requires a new trial and argues that

[Father's] attorney brought up over and over that [Father] should be returned for the trial so that [Father] could be present to testify, to confront the witnesses and to assist his attorney in the trial. This could not be done by the simple phone-hookup that was allowed.

How can one confront the witnesses against him over the phone? The State of Hawai'i *sent* [Father] to the Arizona prison, against his wishes, from prison in Hawai'i in order to house prisoners in Arizona. This was done as a temporary idea by Hawai'i but it was not to be done to deny parents their right to be present at trials or to confront the witnesses against them, we hope. Father also could not assist his court-appointed counsel and that in itself is a denial of the constitutional

right to counsel. The family court could have easily ordered [Father] back to Hawai'i. Instead, by refusing to order him back, [Father] was denied his right to a fair trial and his right to see and confront the witnesses against him and to properly assist his court-appointed counsel in the defense of his case.

. . . .

Father was sent to Arizona against his wishes by the State of Hawai'i, then the State of Hawai'i ends his rights to his children and refuses to bring him to the trial denying his constitutional rights.

(Emphasis in the original.)

## RELEVANT PRECEDENT OF OTHER JURISDICTIONS

In the case of *In re Marriage of Allison*, 126 Ill.App.3d 453, 457, 81 Ill.Dec. 610, 467 N.E.2d 310, 313 (1984), the court stated, in relevant part, as follows:

It is obvious that conviction of a crime and incarceration serve to alter drastically the constitutionally protected status of inmates. Although the very purpose of imprisonment is to deprive persons of many of the rights possessed by citizens, the loss is not total. Chief among the rights that prisoners lose is, of course, the right to freedom of travel and movement. Accordingly, prisoners are not free to attend upon trials in civil cases, even though they may be a party to the proceeding. . . .

But the matter cannot end there. Factors other than isolation of a prisoner from society must be considered. Oftentimes prison inmates have knowledge of transactions that may be essential to a proper adjudication of rights of other parties-litigant before a court in either a civil or criminal case, or a prisoner's testimony may be essential to a proper resolution of disputes involving the propriety of his own conviction and continued detention. It may also be that a prisoner's legally protected civil interests in property or status can be properly adjudicated in a civil case only by resort to the testimony of the prisoner.

In *Moeck v. Zajackowski* (7th Cir.1976), 541 F.2d 177, the court considered the issue of whether a lawfully incarcerated state prisoner was entitled to be personally present at the trial of a civil action that did not relate to the terms of his confinement. The prisoner had filed an action for damages against a police officer in the district court. At the instance of the prisoner, the district court at first issued, but later withdrew, a writ of *habeas corpus ad testificandum*, electing instead to enjoin the prison warden "from interfering in any way with the presence of (the prisoner) in the courtroom of this court (on the stated date and time)." The district court held that the prisoner, in bringing an action pursuant to 42 U.S.C. § 1983, had a fundamental interest of access to the courts for a judicial determination of federal constitutional rights and that that access included the right of personal attendance at trial. The Circuit Court of Appeals reversed.

"We do not agree with the district court as to the content to be ascribed to the fundamental interest of a prisoner in access to the courts. We accord greater weight to the interest of the state in maintaining the confinement of persons serving sentences at the place and institution chosen by the state, in avoiding risks of escape, and in economical administration of custody without incurring expenses which the state reasonably deems unnecessary. * * *

We find no support in the Constitution or in judicial precedent for the proposition that a prison inmate has a fundamental interest in being present at the trial of a civil action to which he is a party, sufficient to outweigh, as a matter of course, the interest of the state in avoiding expense. The due process requirements of the Fifth and Fourteenth Amendments, which guarantee access to the courts, do not grant a prisoner the right to attend court in order to carry on the civil proceedings which he initiates." (*Moeck v. Zajackowski*, 541 F.2d 177, 180.)

The court in the *Moeck* case noted that in *Johnson v. Avery* (1969), 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718, the Supreme Court had extended to prisoners access to

law libraries and jailhouse lawyers to enable them to establish legal claims and to provide them the means to file suits. The court also noted that in *Wolff v. McDonald* [*McDonnell*] (1974), 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, the Supreme Court had declined to extend the right of access to the courts to include personal attendance at trials or hearings. (See also *Bounds v. Smith* (1977), 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72.) The court concluded its discussion of the issue with an acknowledgment that in the proper circumstances the fulfillment of the right of access to the courts may require the personal attendance of a prisoner-party.

"It can be granted that the right of a prisoner to file a civil action may have little meaning if success is reasonably dependent on his immediate presence in court, and such presence is denied. But we would not accord him an automatic right to be present, and thus present the state, as was done by the relief granted here, with the choice of releasing him from custody, or bringing him to court at substantial expense.

We suggest, although it will be seen that it may not be strictly necessary to this decision, that the determination whether a prisoner's interest in being present in court outweighs the state's relevant interests, is a discretionary one. Some of the relevant considerations would seem to be: How substantial is the matter at issue? How important is an early determination of the matter? Can the trial reasonably be delayed until the prisoner is released? Have possible dispositive questions of law been decided? Has the prisoner shown a probability of success? Is the testimony of the prisoner needed? If needed, will a deposition be reasonably adequate? Is the prisoner represented? If not, is his presence reasonably necessary to present his case?" (*Moeck v. Zajackowski*, 541 F.2d 177, 181.)

The *Moeck* court remanded the case to the district court for that court to exercise its discretion in making a determination whether presence of the prisoner at the trial was reasonably necessary or not and

for further proceedings consistent with the opinion.

We have determined that the approach of Illinois courts to the matter of attendance of prisoners at court proceedings to which they are a party is similar to that expressed in *Moeck v. Zajackowski*, although never so succinctly stated in any Illinois authority. Illinois has a statute that empowers circuit courts to obtain the attendance of prisoners "to testify" at trials, either civil or criminal. That statute, ... is, in the Illinois Revised Statutes, entitled "Habeas Corpus to testify," and parallels the common law writ of *habeas corpus ad testificandum*.

Whether the testimony of a prisoner is sought for a civil or a criminal case, and whether or not the prisoner is a party to the case, it is a matter that lies within the sound discretion of the court whether to issue an order of *habeas corpus ad testificandum*. (By virtue of ch. 110, par. 2–1501, "writs" are abolished. Accordingly we use the term "order" of *habeas corpus ad testificandum*.)

*In re Marriage of Allison*, 126 Ill.App.3d at 457–60, 81 Ill.Dec. 610, 467 N.E.2d at 313–14.

In the case of *In re Cleopatra D., a Minor*, 193 Cal.App.3d 694, 697–98, 238 Cal.Rptr. 426, 426–27 (Cal.App.1987), the court stated, in relevant part, as follows:

The San Diego County Department of Social Services (County) petitioned to free Cleopatra D. from the custody and control of her mother, Rosemary D. (Rosemary), alleging cruel treatment and/or neglect and failure to maintain an adequate parental relationship.... Neither Rosemary nor the presumed father appeared at trial. Rosemary appeals judgment in favor of the County on grounds the court's refusal to authorize travel expenses from Saginaw, Michigan denied her due process, equal protection and effective assistance of counsel.... We affirm the judgment.

## DISCUSSION

### I

Before trial Rosemary and Cleopatra's presumed father joined in a motion re-

questing transportation expenses from their home in Saginaw, Michigan, to San Diego to attend the trial. Rosemary asked that the travel costs be paid by the County. The court denied the motion for lack of statutory authority and because the history of the case "indicated absolutely no effort by the parents to have any contact with the child." Rosemary renewed her motion at the close of the County's case. The court again denied the motion on grounds that: (1) counsel for the parents had made no pretrial offer of proof of the parents' anticipated testimony; (2) the parents had failed to comply with the reunification plan, which constituted abandonment; and (3) counsel for the parents had sufficient time to file a writ after the motion was first denied, but failed to do so.

Rosemary's due process and equal protection challenge raises questions concerning the nature of parental rights and the extent to which such rights are accorded constitutional protection. Although our courts acknowledge that parenting is a fundamental right to be disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood (*In re Angelia P.* (1981) 28 Cal.3d 908, 916[, 171 Cal.Rptr. 637, 623 P.2d 198]), the civil nature of section 232 proceedings limits the rights available to parents in that context. There is no federal constitutional right to counsel in a section 232 proceeding. (*Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 31–32[, 101 S.Ct. 2153, 2161–2162, 68 L.Ed.2d 640].) We have been cited to no case which suggests the court is constitutionally mandated to order the County to pay Rosemary's travel expenses here. Civil Code sections 237.5 and 237.7 provide for appointment of counsel and free transcripts for indigent parents. However, these are statutory, not constitutional rights. While we may agree with Rosemary that the right of indigent parents to be present at a proceeding to permanently sever the parent-child relationship is at least as important as the right to a transcript on appeal of judgment in that proceeding, the Legislature has not elected to authorize use of public funds for that purpose.[2] [Footnote

2 states as follows: "Penal Code section 2625 establishes a procedure through which state prisoners incarcerated in California are able to attend section 232 hearings. However, this court has held that a father is not denied equal protection of the law, even though he is unable to be physically present at the section 232 proceedings, where he is confined in an out-of-state prison and therefore not subject to the rights created under Penal Code section 2625. (*In re Gary U.* (1982) 136 Cal. App.3d 494, 186 Cal.Rptr. 316.)"] Even if there were a basis for payment of travel expenses in cases where a parent's testimony is necessary to insure due process and a constitutionally fair resolution of a section 232 proceeding, counsel's failure to make an offer of proof of Rosemary's anticipated testimony permits us to only speculate on the nature of that testimony. We conclude the court did not abuse its discretion in denying Rosemary's motion for transportation costs to attend trial.

Rosemary also argues that denial of her motion for travel expenses made it impossible for her attorney to provide effective representation at trial. Her attorney asserts he was unable to effectively communicate with her either by telephone or by mail. Rosemary's second argument fails for the same reasons as the first. Furthermore, a 1984 psychological evaluation determined that Rosemary had a full scale I.Q. of 66, placing her in the mild range of mental impairment. The probation report also states that Rosemary did not have the ability to provide for herself and that she needed support and guidance in making decisions on a day-to-day basis. Rosemary's counsel provided no reason Rosemary would be able to communicate more effectively with him in person than by telephone or mail.

In the case of *Levi v. District of Columbia*, 697 A.2d 1201, 1205–06 (1997), the court stated, in relevant part, as follows:

But even assuming for the sake of argument that the court should have considered Mr. Levi's *pro se* petition to appear at trial and ignored the contrary prior request of his counsel, the court's denial of the *pro se*

petition must be affirmed. The Supreme Court has stated:

> Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. Among those so limited is the otherwise unqualified right given by [statute] to parties in all the courts of the United States to "plead and manage their own causes personally."

*Price v. Johnston*, 334 U.S. 266, 285–286, 68 S.Ct. 1049, 1060–1061, 92 L.Ed. 1356 (1948) (citation omitted). This court has not yet decided whether a prisoner has a right to attend a civil trial in which he is a party, but several federal courts, reading the Supreme Court's *Price* opinion, have held that the decision whether to grant a prisoner's request to attend his civil trial is within the discretion of the trial court. *See, e.g., Michaud v. Michaud*, 932 F.2d 77, 81 (1st Cir.1991); *Poole v. Lambert*, 819 F.2d 1025, 1028 (11th Cir.1987); *Holt v. Pitts*, 619 F.2d 558, 561 (6th Cir.1980), aff'd after remand, 702 F.2d 639 (1983).[4] [Footnote 4 states as follows: "Although the specific issue in *Price* was whether a prisoner had the right to attend an appellate proceeding and argue his own *habeas corpus* appeal, federal courts have applied the holding in *Price* to trial proceedings as well. *Stone v. Morris*, 546 F.2d 730, 735 n. 6 (7th Cir.1976); *see Holt v. Pitts*, supra, 619 F.2d at 560 ("[g]enerally speaking, prisoners who bring civil actions ... have no right to be personally present at any stage of the judicial proceedings"); *see also Helminski v. Ayerst Laboratories*, 766 F.2d 208, 213 (6th Cir.) ("[n]either the Fifth Amendment's due process clause nor the Seventh Amendment's guarantee of a jury trial grants to a civil litigant the absolute right to be present personally during the trial of his case"), cert. denied, 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985)."] Among the factors to be considered are the burden on the state in transporting and securing the prisoner and the existence of alternative means for presenting the testimony sought. *Michaud*, supra, 932 F.2d at 81. A court may also take into account "whether the prisoner has any other witnesses to call at trial or whether ... the prisoner is the only person who can render testimony consistent with the allegations of his complaint...." *Stone*, supra note 4, 546 F.2d at 736. In addition, prejudice to the prisoner is minimized when the prisoner-litigant is represented by counsel, as Mr. Levi was in this case. *Helminski*, supra note 4, 766 F.2d at 213.

In *Taylor v. Taylor*, 63 S.W.3d 93, 96–98 (Tex.Crim.App.2001), the court stated, in relevant part, as follows:

## RIGHT TO APPEAR

Richard argues ... that the court abused its discretion and violated his right to due process of law by refusing his request to be bench warranted to McLennan County for his trial. Valerie questions whether Richard made a sufficient request for a bench warrant because his request is "[i]n the middle of the request for a reset." The Attorney General contends that he did not provide sufficient justification for his request to personally appear.

In a prior, related proceeding, we discussed at length the law pertinent to a prisoner's constitutional right of access to the courts. *See In re Taylor*, 28 S.W.3d 240, 249 (Tex.App.-Waco 2000, orig. proceeding); *see also In re Taylor*, 39 S.W.3d 406, 412 (Tex.App.-Waco 2001, orig. proceeding).[4] [Footnote 4 states as follows: "In the original proceeding reported at 28 S.W.3d 240, Richard sought a writ of mandamus compelling the trial court to act on his contempt motion, in which he alleged that Valerie had failed to comply with the divorce decree which is the subject of this appeal, and on his application for writ of *habeas corpus ad testificandum* by which he sought to appear and present evidence on the contempt motion. *See In re Taylor*, 28 S.W.3d 240, 243–44 (Tex.App.-Waco 2000, orig. proceeding). We conditionally granted the relief requested. *Id.* at 250. We again conditionally granted mandamus relief after the trial court denied Taylor's writ application apparently without considering the factors noted in the prior mandamus proceeding. *See In re Taylor*, 39

S.W.3d 406, 412–14 (Tex.App.-Waco 2001, orig. proceeding)."] We observed:

"A prisoner in Texas has a constitutional right of access to the courts, but only a qualified right to appear personally at a civil proceeding." Texas courts have followed the lead of the federal courts in identifying pertinent factors to be considered in deciding whether an inmate should be permitted to personally appear.

These factors include:

(1) the cost and inconvenience of transporting the inmate to court; (2) the security risk and danger to the court and the public by allowing the inmate to attend court; (3) whether the inmate's claims are substantial; (4) whether a determination of the matter can reasonably be delayed until the inmate is released; (5) whether the inmate can and will offer admissible, noncumulative testimony that cannot be offered effectively by deposition, telephone, or otherwise; (6) whether the inmate's presence is important in judging his demeanor and credibility compared with that of other witnesses; (7) whether the trial is to the court or to a jury; and (8) the inmate's probability of success on the merits.

*Taylor*, 28 S.W.3d at 249 (citations omitted); accord *Dodd v. Dodd*, 17 S.W.3d 714, 717–18 (Tex.App.-Houston [1st Dist.] 2000, no pet.); *Byrd v. Attorney General*, 877 S.W.2d 566, 569 (Tex.App.-Beaumont 1994, no writ).

In addition to the eight factors we listed in *Taylor*, courts have attached some importance to whether the prisoner initiated the lawsuit. *See Dodd*, 17 S.W.3d at 717–18; *Armstrong v. Randle*, 881 S.W.2d 53, 57–58 (Tex.App.-Texarkana 1994, writ denied); *Pruske v. Dempsey*, 821 S.W.2d 687, 689 (Tex.App.-San Antonio 1991, no writ). It appears that a prisoner's status as a defendant weighs in his favor on the issue of his right to personally appear at trial. *Id.* However, an inmate's status as a defendant standing alone will not generally suffice to establish his right to appear. *Id.* Conversely, the fact that the inmate is the plaintiff will not necessarily preclude his

right to personally appear. *See Armstrong*, 881 S.W.2d at 58; *Nichols v. Martin*, 776 S.W.2d 621, 623 (Tex.App.-Tyler 1989, no writ).

We further observed in *Taylor*:

Should the trial court determine after considering these factors that the prisoner is not entitled to appear personally, then the court should permit him "to proceed by affidavit, deposition, telephone, or other effective means."

A trial court's refusal to consider and rule upon a prisoner's request to appear in a civil proceeding personally or by other means constitutes an abuse of discretion.

*Taylor*, 28 S.W.3d at 249 (citations omitted); accord *Dodd*, 17 S.W.3d at 717–18; *Byrd*, 877 S.W.2d at 569.

Although, as noted in footnote 1 above, Judge Luke pointed Father in the direction of the research that needed to be done, it appears that Father is not aware of HRS Chapter 660 (1993), which covers the subject of "Habeas Corpus" and states, in relevant part, as follows:

§ 660–4 **For prisoners, for trial or testimony.** Nothing in this chapter shall be construed to restrain the power of any court of record to issue a writ of habeas corpus ad respondendum, when necessary, to bring before it any prisoner for trial in any criminal cause, lawfully pending in the court, or a writ of habeas corpus ad testificandum, to bring in any prisoner to be examined as a witness in any action or proceeding, civil or criminal, pending in the court, when it thinks the personal attendance and examination of the witness is necessary for the attainment of justice. The writ may be issued for such purposes by any court of record in the exercise of a sound discretion, and with due regard to conflicting interests and liabilities, anything in this chapter to the contrary notwithstanding.

§ 660–5 **Complaint.** Application for the writ or an order to show cause shall be made to the court or judge authorized to issue the same, by complaint in writing, signed by the party for whose relief it is

intended, or by some person in the party's behalf, setting forth:

(1) The person by whom, and the place where, the party is imprisoned or restrained, naming the party and the person detaining the party, if their names are known, and describing them if they are not known;

(2) The cause or pretense of imprisonment or restraint, according to the knowledge and belief of the applicant;

(3) If the imprisonment or restraint is by virtue of any warrant or other process, an annexed copy thereof, unless it is made to appear that a sufficient reason exists for not annexing the same;

(4) That there has been no determination of the legality of the detention on a prior application for a petition for a writ of habeas corpus, or, if there has been a previous determination, the new grounds, if any, not presented and determined upon the previous application.

The facts alleged shall be verified by the oath of some credible person, to be administered by any person authorized to administer oaths.

§ 660–6   Form of writ.   The court or judge to whom the complaint is made shall, without delay, award and issue the writ unless it appears from the application that the person detained is not entitled thereto or an order to show cause is issued under section 660–7.   The writ of habeas corpus may be in the following form:

State of Hawai'i.

To  ........................  greeting.

We command you that immediately upon the receipt of this writ, you have and produce before .... at .... the body of .... who is unjustly imprisoned and restrained of his liberty, as it is said, to do and receive what shall then and there be considered concerning him in this behalf. And have you there this writ, with your doings thereon.

Witness the Honorable .... this .... day of.... 19 ...

[Seal]

§ 660–7   Order to show cause in lieu of writ.   The court or judge to whom the complaint is made may issue an order directing the person by whom the party is imprisoned or restrained, to appear and show cause for the imprisonment or restraint at such time as the court shall direct, but not later than five days from the date of the order to show cause; provided that whenever the record shows that there is a material issue of fact to be resolved by the taking of evidence the court shall order that the person detained be produced for the hearing.

....

§ 660–15   Costs.   If the party is confined in any prison or is in the custody of any civil officer, the court or judge granting the writ shall certify thereon the sum to be paid for the expense of bringing the party from the place where the party is imprisoned or restrained.   The officer to whom the same is directed shall not be bound to obey it, unless that sum is paid or tendered to the officer. This section is subject to section 607–3 ["Court costs, waiver of prepayment, reduction or remission of"], pursuant to which prepayment of the expense may be waived, or the sum required may be reduced or remitted.

....

§ 660–17   Return to be prompt.   Any person to whom a writ of habeas corpus is directed, upon payment or tender of reasonable charges or expenses for its execution if ordered by the court, and any person to whom an order to show cause is directed, shall make return thereto with as much promptness as the nature of the case will permit.

§ 660–18   Contents.   The person making the return shall state therein, in writing, plainly and unequivocally:

(1) Whether he has or has not the person designated in his custody or power, or in any manner under his restraint or control;

(2) If he has the person in his custody or power, or under his restraint or

control, the authority, and the time, and whole cause of such imprisonment or restraint, with a copy of any process or warrant under which the person is detained;

(3) If he has had the person in his custody or power, or under his restraint or control, and has transferred such custody, restraint, or control to another, or if he has any knowledge or suspicion that any other person exercises or claims to exercise such custody, power, restraint, or control, all that he knows or suspects.

No return shall be adjudged sufficient when the respondent has once held the person in his custody or power, or under his restraint or control, unless it states fully all that the respondent knows or suspects, or alleges unequivocally that he neither knows nor suspects, nor has any cause to suspect anything as to the custody or restraint of the person alleged to be detained, up to the time of making the return.

**§ 660–19  Signature, oath, evidence.** The return shall be signed by the person making it, and sworn to by the person, unless the person is a sworn public officer making the return in the person's official capacity. The return shall be evidence in the case, but not conclusive.

**§ 660–20  Body to be produced, except when.** The person making the return to a writ of habeas corpus shall bring the body of the person, if in his custody or power, or under his restraint or control, according to the command in the writ, unless prevented by the sickness or infirmity of the person. This shall not prevent the person making the return, if a private person, from demanding in advance actual necessary expenses of travel and transportation.

**§ 660–21  Procedure in case of sickness, etc.** When from sickness or infirmity of the person, the person cannot properly be brought to the place appointed for the return, that fact shall be set forth, and if verified by affidavit and established to the satisfaction of the court, the hearing may be adjourned to such other time or place or such order may be made as justice may require.

**§ 660–22  Disobeying writ or order to show cause, penalties.** Any person who neglects or refuses promptly to perform any duty imposed upon such person by virtue of any writ of habeas corpus or order to show cause, conformably to this chapter, shall be responsible in a civil action to any person aggrieved for damages occasioned thereby, and may be fined not more than $5,000, or imprisoned at hard labor not more than ten years, or both.

**§ 660–23  Evading service, penalties.** The liabilities and penalties of section 660–22 shall also be imposed upon any person who, having in his custody or under his power any person entitled to a writ of habeas corpus, with intent to elude the service of the writ or to avoid the effect thereof, transfers such person to the custody or places him under the control or power of any other person, or conceals him or changes his place of confinement.

As noted above, HRS § 660–4 states, in relevant part, that

[n]othing in this chapter shall be construed to restrain the power of any court of record to issue ... a writ of habeas corpus ad testificandum, to bring in any prisoner to be examined as a witness in any action or proceeding, civil or criminal, pending in the court, when it thinks the personal attendance and examination of the witness is necessary for the attainment of justice. The writ may be issued for such purposes by any court of record in the exercise of a sound discretion, and with due regard to conflicting interests and liabilities, anything in this chapter to the contrary notwithstanding.

HRS § 660–15 states, in relevant part, that

[i]f the party is confined in any prison or is in the custody of any civil officer, the court or judge granting the writ shall certify thereon the sum to be paid for the expense of bringing the party from the place where the party is imprisoned or restrained. The officer to whom the same is directed shall not be bound to obey it, unless that sum is paid or tendered to the officer. This sec-

tion is subject to section 607–3 [2], pursuant to which prepayment of the expense may be waived, or the sum required may be reduced or remitted.

(Footnote added.)

Had Father complied with the procedural requirements of HRS Chapter 660, the family court then would have been validly called upon to exercise its discretion in determining whether to serve a writ of habeas corpus ad testificandum upon the DPS. Father, however, did not comply with the procedural requirements of HRS Chapter 660, and the family court was not validly called upon to exercise its discretion.

## CONCLUSION

Accordingly, we affirm the family court's (1) Order Awarding Permanent Custody entered on November 6, 2001, and (2) order filed on November 16, 2001, denying Father's motion for reconsideration.

2. Hawai'i Revised Statutes § 607–3 (1993) states as follows:

The judges of all the courts of the State shall have discretionary power to waive the prepayment of costs or to reduce or remit costs where, in special or extraordinary cases, the cost of any suit, action, or proceeding may, to the judges, appear onerous.