## JOHNSON *v.* AVERY, COMMISSIONER OF CORRECTION, ET AL.

No. 40. Argued November 14, 1968.—Decided February 24, 1969.

*Karl P. Warden* argued the cause for petitioner. With him on the brief was *Pierce Winningham.*

*Thomas E. Fox,* Deputy Attorney General of Tennessee, argued the cause for respondents. With him on the brief were *George F. McCanless,* Attorney General, and *David W. McMackin,* Assistant Attorney General.

*Melvin L. Wulf* filed a brief for the American Civil Liberties Union et al., as *amici curiae,* urging reversal.

*Thomas C. Lynch,* Attorney General of California, *Albert W. Harris, Jr.,* Assistant Attorney General, and *Robert R. Granucci* and *George R. Nock,* Deputy Attorneys General, filed a brief for the State of California, as *amicus curiae,* urging affirmance.

MR. JUSTICE FORTAS delivered the opinion of the Court.

## I.

Petitioner is serving a life sentence in the Tennessee State Penitentiary. In February 1965 he was transferred to the maximum security building in the prison for violation of a prison regulation which provides:

> "No inmate will advise, assist or otherwise contract to aid another, either with or without a fee, to prepare Writs or other legal matters. It is not intended that an innocent man be punished. When a man believes he is unlawfully held or illegally convicted, he should prepare a brief or state his complaint in letter form and address it to his lawyer or a judge. A formal Writ is not necessary to receive a hearing. False charges or untrue complaints may be punished. Inmates are forbidden to set themselves up as practitioners for the purpose of promoting a business of writing Writs."

In July 1965 petitioner filed in the United States District Court for the Middle District of Tennessee a "motion for law books and a typewriter," in which he sought relief from his confinement in the maximum security building. The District Court treated this motion as a petition for a writ of habeas corpus and, after a hearing, ordered him released from disciplinary confinement and restored to the status of an ordinary prisoner. The District Court held that the regulation was void because it in effect barred illiterate prisoners from access to federal habeas corpus and conflicted with 28 U. S. C. § 2242.[1]  252 F. Supp. 783.

---

[1] 28 U. S. C. § 2242 provides in part: "Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf."

By the time the District Court order was entered, petitioner had been transferred from the maximum security building, but he had been put in a disciplinary cell block in which he was entitled to fewer privileges than were given ordinary prisoners. Only when he promised to refrain from assistance to other inmates was he restored to regular prison conditions and privileges. At a second hearing, held in March 1966, the District Court explored these issues concerning the compliance of the prison officials with its initial order. After the hearing, it reaffirmed its earlier order.

The State appealed. The Court of Appeals for the Sixth Circuit reversed, concluding that the regulation did not unlawfully conflict with the federal right of habeas corpus. According to the Sixth Circuit, the interest of the State in preserving prison discipline and in limiting the practice of law to licensed attorneys justified whatever burden the regulation might place on access to federal habeas corpus. 382 F. 2d 353.

## II.

This Court has constantly emphasized the fundamental importance of the writ of habeas corpus in our constitutional scheme,[2] and the Congress has demonstrated its solicitude for the vigor of the Great Writ.[3] The Court has steadfastly insisted that "there is no higher duty than to maintain it unimpaired." *Bowen* v. *Johnston,* 306 U. S. 19, 26 (1939).

Since the basic purpose of the writ is to enable those unlawfully incarcerated to obtain their freedom, it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed. For example, the Court has held that a State may not validly make the writ available

---

[2] *E. g., Fay* v. *Noia,* 372 U. S. 391 (1963).

[3] 28 U. S. C. §§ 2241–2255.

only to prisoners who could pay a $4 filing fee. *Smith v. Bennett,* 365 U. S. 708 (1961). And it has insisted that, for the indigent as well as for the affluent prisoner, post-conviction proceedings must be more than a formality. For instance, the State is obligated to furnish prisoners not otherwise able to obtain it, with a transcript or equivalent recordation of prior habeas corpus hearings for use in further proceedings. *Long* v. *District Court,* 385 U. S. 192 (1966). Cf. *Griffin* v. *Illinois,* 351 U. S. 12 (1956).

Tennessee urges, however, that the contested regulation in this case is justified as a part of the State's disciplinary administration of the prisons. There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene. It is clear, however, that in instances where state regulations applicable to inmates of prison facilities conflict with such rights, the regulations may be invalidated.

For example, in *Lee* v. *Washington,* 390 U. S. 333 (1968), the practice of racial segregation of prisoners was justified by the State as necessary to maintain good order and discipline. We held, however, that the practice was constitutionally prohibited, although we were careful to point out that the order of the District Court, which we affirmed, made allowance for "the necessities of prison security and discipline." *Id.,* at 334. And in *Ex parte Hull,* 312 U. S. 546 (1941), this Court invalidated a state regulation which required that habeas corpus petitions first be submitted to prison authorities and then approved by the "legal investigator" to the parole board as "properly drawn" before being transmitted to the court. Here again, the State urged that the requirement was necessary to maintain prison discipline. But this Court held that the regulation violated the principle that "the state and its officers may not

abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." 312 U. S., at 549. Cf. *Cochran* v. *Kansas,* 316 U. S. 255, 257 (1942).

There can be no doubt that Tennessee could not constitutionally adopt and enforce a rule forbidding illiterate or poorly educated prisoners to file habeas corpus petitions. Here Tennessee has adopted a rule which, in the absence of any other source of assistance for such prisoners, effectively does just that. The District Court concluded that "[f]or all practical purposes, if such prisoners cannot have the assistance of a 'jail-house lawyer,' their possibly valid constitutional claims will never be heard in any court." 252 F. Supp., at 784. The record supports this conclusion.

Jails and penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited.[4] This appears to be equally true of Tennessee's prison facilities.[5]

In most federal courts, it is the practice to appoint counsel in post-conviction proceedings only after a petition for post-conviction relief passes initial judicial evaluation and the court has determined that issues are presented calling for an evidentiary hearing. *E. g., Taylor* v. *Pegelow,* 335 F. 2d 147 (C. A. 4th Cir. 1964); *United States ex rel. Marshall* v. *Wilkins,* 338 F. 2d 404 (C. A. 2d Cir. 1964). See 28 U. S. C. § 1915 (d); R. Sokol, A Handbook of Federal Habeas Corpus 71–73 (1965).[6]

---

[4] See Note, Constitutional Law: Prison "No-Assistance" Regulations and the Jailhouse Lawyer, 1968 Duke L. J. 343, 347–348, 360–361.

[5] Tennessee Department of Correction, Departmental Report: Fiscal Years 1965–1966, 1966–1967.

[6] Tennessee's post-conviction procedure provides for appointment of counsel "if necessary." Tenn. Code Ann. §§ 40–3821, 40–2019 (Supp. 1967).

It has not been held that there is any general obligation of the courts, state or federal, to appoint counsel for prisoners who indicate, without more, that they wish to seek post-conviction relief. See, *e. g., Barker* v. *Ohio,* 330 F. 2d 594 (C. A. 6th Cir. 1964). Accordingly, the initial burden of presenting a claim to post-conviction relief usually rests upon the indigent prisoner himself with such help as he can obtain within the prison walls or the prison system. In the case of all except those who are able to help themselves—usually a few old hands or exceptionally gifted prisoners—the prisoner is, in effect, denied access to the courts unless such help is available.

It is indisputable that prison "writ writers" like petitioner are sometimes a menace to prison discipline and that their petitions are often so unskillful as to be a burden on the courts which receive them.[7] But, as this Court held in *Ex parte Hull, supra,* in declaring invalid a state prison regulation which required that prisoners' legal pleadings be screened by state officials:

> "The considerations that prompted [the regulation's] formulation are not without merit, but the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." 312 U. S., at 549.

Tennessee does not provide an available alternative to the assistance provided by other inmates. The warden of the prison in which petitioner was confined stated that the prison provided free notarization of prisoners' petitions. That obviously meets only a formal requirement. He also indicated that he sometimes allowed prisoners to examine the listing of attorneys in the Nashville telephone directory so they could select one to write to in an effort to interest him in taking the case, and

---

[7] See, *e. g.,* Spector, A Prison Librarian Looks at Writ-Writing, 56 Calif. L. Rev. 365 (1968).

that "on several occasions" he had contacted the public defender at the request of an inmate. There is no contention, however, that there is any regular system of assistance by public defenders. In its brief the State contends that "[t]here is absolutely no reason to believe that prison officials would fail to notify the court should an inmate advise them of a complete inability, either mental or physical, to prepare a habeas application on his own behalf," but there is no contention that they have in fact ever done so.

This is obviously far short of the showing required to demonstrate that, in depriving prisoners of the assistance of fellow inmates, Tennessee has not, in substance, deprived those unable themselves, with reasonable adequacy, to prepare their petitions, of access to the constitutionally and statutorily protected availability of the writ of habeas corpus. By contrast, in several States,[8] the public defender system supplies trained attorneys, paid from public funds, who are available to consult with prisoners regarding their habeas corpus petitions. At least one State employs senior law students to interview and advise inmates in state prisons.[9] Another State has a voluntary program whereby members of the local bar association make periodic visits to the prison to consult with prisoners concerning their cases.[10] We express no judgment concerning these plans,

---

[8] Note, *supra,* n. 4, at 349, n. 27, and 359. See also Rossmoore & Koenigsberg, Habeas Corpus and the Indigent Prisoner, 11 Rutgers L. Rev. 611, 619–622 (1957).

[9] At the time of the second hearing in petitioner's case, the warden testified, the State was considering setting up a program under which senior law students from Vanderbilt Law School would assist prisoners in the preparation of post-conviction relief applications. For whatever it may be worth, petitioner testified that he would stop helping other inmates if such a system were in existence.

[10] One State has designated an inmate as the official prison writ-writer. See Note, *supra,* n. 4, at 359.

but their existence indicates that techniques are available to provide alternatives if the State elects to prohibit mutual assistance among inmates.

Even in the absence of such alternatives, the State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief: for example, by limitations on the time and location of such activities and the imposition of punishment for the giving or receipt of consideration in connection with such activities. Cf. *Hatfield* v. *Bailleaux*, 290 F. 2d 632 (C. A. 9th Cir. 1961) (sustaining as reasonable regulations on the time and location of prisoner work on their own petitions). But unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners.[11]

The judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[11] In reversing the District Court, the Court of Appeals relied on the power of the State to restrict the practice of law to licensed attorneys as a source of authority for the prison regulation. The power of the States to control the practice of law cannot be exercised so as to abrogate federally protected rights. *NAACP* v. *Button*, 371 U. S. 415 (1963); *Sperry* v. *Florida*, 373 U. S. 379 (1963). In any event, the type of activity involved here—preparation of petitions for post-conviction relief—though historically and traditionally one which may benefit from the services of a trained and dedicated lawyer, is a function often, perhaps generally, performed by laymen. Title 28 U. S. C. § 2242 apparently contemplates that in many situations petitions for federal habeas corpus relief will be prepared by laymen.

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, I add a few words in emphasis of the important thesis of the case.

The increasing complexities of our governmental apparatus at both the local and the federal levels have made it difficult for a person to process a claim or even to make a complaint. Social security is a virtual maze; the hierarchy that governs urban housing is often so intricate that it takes an expert to know what agency has jurisdiction over a particular complaint; the office to call or official to see for noise abatement, for a broken sewer line, or a fallen tree is a mystery to many in our metropolitan areas.

A person who has a claim assertable in faraway Washington, D. C., is even more helpless, as evidenced by the increasing tendency of constituents to rely on their congressional delegation to identify, press, and process their claims.

We think of claims as grist for the mill of the lawyers. But it is becoming abundantly clear that more and more of the effort in ferreting out the basis of claims and the agencies responsible for them and in preparing the almost endless paperwork for their prosecution is work for laymen. There are not enough lawyers to manage or supervise all of these affairs; and much of the basic work done requires no special legal talent. Yet there is a closed-shop philosophy in the legal profession that cuts down drastically active roles for laymen. It was expressed by a New York court in denying an application from the Neighborhood Legal Services for permission to offer a broad legal-aid type of service to indigents:

> "[I]n any legal assistance corporation, supported by Federal antipoverty funds, the executive staff, and those with the responsibility to hire and discharge staff from the very top to the lowest lay

echelon must be lawyers." *Matter of Action for Legal Services,* 26 App. Div. 2d 354, 360, 274 N. Y. S. 2d 779, 787 (1966).

That traditional, closed-shop attitude is utterly out of place in the modern world [1] where claims pile high and much of the work of tracing and pursuing them requires the patience and wisdom of a layman rather than the legal skills of a member of the bar.

> "If poverty lawyers are overworked, some of the work can be delegated to sub-professionals. New York law permits senior law students to practice law under certain supervised conditions. Approval must first be granted by the appellate division. A rung or two lower on the legal profession's ladder are laymen legal technicians, comparable to nurses and lab assistants in the medical profession. Large law firms employ them, and there seems to be no reason why they cannot be used in legal services programs to relieve attorneys for more professional tasks." Samore, Legal Services for the Poor, 32 Albany L. Rev. 509, 515–516 (1968).

And see Sparer, Thorkelson, & Weiss, The Lay Advocate, 43 U. Det. L. J. 493, 510–514 (1966).

The plight of a man in prison may in these respects be even more acute than the plight of a person on the outside. He may need collateral proceedings to test the legality of his detention [2] or relief against management

---

[1] The New York program that is funded by the Office of Economic Opportunity (OEO) and which as noted was first rejected by the New York courts, is called Community Action for Legal Services. It was finally approved by the New York courts with a board of directors of 20 lawyers and 10 laymen. 158 N. Y. L. J. No. 72, pp. 1, 5 (1967).

[2] Reitz, Federal Habeas Corpus: Postconviction Remedy for State Prisoners, 108 U. Pa. L. Rev. 461 (1960).

of the parole system[3] or against defective detainers lodged against him which create burdens in the nature of his incarcerated status.[4] He may have grievances of a civil nature against those outside the prison. His imprisonment may give his wife grounds for divorce and be a factor in determining the custody of his children; and he may have pressing social security, workmen's compensation, or veterans' claims.[5]

While the demand for legal counsel in prison is heavy, the supply is light. For private matters of a civil nature, legal counsel for the indigent in prison is almost nonexistent. Even for criminal proceedings, it is sparse.[6] While a few States have post-conviction statutes providing such counsel,[7] most States do not.[8] Some States like California do appoint counsel to represent the indigent prisoner in his collateral hearings, once he succeeds in making out a prima facie case.[9] But as a result, counsel

[3] Hubanks & Linde, Legal Services to the Indigent Imprisoned, 23 Legal Aid Briefcase 214 (1965).

[4] Temin, Report on Postconviction Services to the County Prison, 25 Legal Aid Briefcase 18 (1966).

[5] Note, Constitutional Law: Prison "No-Assistance" Regulations and the Jailhouse Lawyer, 1968 Duke L. J. 343.

[6] L. Silverstein, Defense of the Poor in Criminal Cases in American State Courts: A Preliminary Summary (Amer. Bar Foundation 1964); Note, Legal Services for the Poor, 49 Mass. L. Q. 293 (1964); O. E. O. and Legal Services—A Symposium, 14 Catholic Law. 92–174 (1968); Note, Legal Services for Prison Inmates, 1967 Wis. L. Rev. 514; Uelmen, Post-Conviction Relief for Federal Prisoners Under 28 U. S. C. § 2255: A Survey and a Suggestion, 69 W. Va. L. Rev. 277 (1967).

[7] Ill. Rev. Stat., c. 38, § 122–4 (1967); Ore. Rev. Stat. § 138.590 (1967).

[8] Comment, Right to Counsel in Criminal Post-Conviction Review Proceedings, 51 Calif. L. Rev. 970 (1963).

[9] See, e. g., People v. Shipman, 62 Cal. 2d 226, 397 P. 2d 993 (1965). Note, Indigent's Right to Counsel in Post-Conviction Collateral Proceedings in California: People v. Shipman, 13 U. C. L. A. L. Rev. 446 (1966).

is not on hand for preparation of the papers or for the initial decision that the prisoner's claim has substance.

Many think that the prisoner needs help at an early stage to weed out frivolous claims.[10] Some States have Legal Aid Societies, sponsored in part by the National Legal Aid and Defender Association, that provide post-conviction counsel to prisoners.[11] Most legal aid offices, however, have so many pressing obligations of a civil and criminal nature in their own communities and among freemen, as not to be able to provide any satisfactory assistance to prisoners.[12] The same thing is true of OEO-sponsored Neighborhood Legal Services offices, which see their function as providing legal counsel for a particular community, which a member leaves as soon

[10] "Lawyers generally require at least a fifty dollar fee to travel to the prisons to consult with a prisoner. The ones not able to pay this sum must resort to the next best course of action—act as their own lawyers. The disadvantages to the prisoner are obvious. A lawyer, after examining the prisoner's transcripts or conducting an independent investigation of the facts, could immediately advise him on a course of action. Lacking the money to hire a lawyer, the prisoner must spend considerable time researching the law, preparing the required legal documents, and filing them. Sometimes years pass before the prisoner discovers what a lawyer could have told him in several weeks—that his case either has or lacks merit. The prisoners who have militantly prosecuted frivolous actions have wasted time they could have devoted to preparing themselves for release from prison. The state, by shouldering these indigent prisoners with the responsibility of acting as their own counsel, has dissipated the taxpayers' money in wasted manpower and court costs." Larsen, A Prisoner Looks at Writ-Writing, 56 Calif. L. Rev. 343, 345–346 (1968).

[11] Note, Legal Services for the Poor, 49 Mass. L. Q. 293 (1964).

[12] Note, Representation of Indigent Criminal Defendants in the Federal District Courts, 76 Harv. L. Rev. 579 (1963); Note, Representation of Indigents in California—A Field Study of the Public Defender and Assigned Counsel Systems, 13 Stan. L. Rev. 522 (1961); Gardiner, Defects in Present Legal Aid Service and the Remedies, 22 Tenn. L. Rev. 505 (1952); Note, Prisoner Assistance on Federal Habeas Corpus Petitions, 19 Stan. L. Rev. 887 (1967).

as he is taken to prison.[13]  In some cases, state public defenders will represent a man even after he passes beyond prison walls. But more often, the public defender has no general authorization to process post-conviction matters.[14]

Some States have experimented with programs designed especially for the prison community.  The Bureau of Prisons led the way with a program of allowing senior law students to service the federal penitentiary at Leavenworth, Kansas.  Since then, it has encouraged similar programs at Lewisburg (University of Pennsylvania Law School) and elsewhere.  Emory University School of Law provides free legal assistance to the inmates of Atlanta Federal Penitentiary.  The program of the law school at the University of California at Los Angeles is now about to reach inside federal prisons.  In describing the University of Kansas Law School program at Leavenworth, legal counsel for the Bureau of Prisons has said:

> "The experience at Leavenworth has shown that there have been very few attacks upon the [prison] administration; that prospective frivolous litigation has been screened out and that where the law school felt the prisoner had a good cause of action relief was granted in a great percentage of cases. A large part of the activity was disposing of long outstanding detainers lodged against the inmates. In addition, the program handles civil matters such as domestic relations problems and compensation claims.  Even where there has been no tangible success, the fact that the inmate had someone on the outside listen to him and analyze his problems had a most beneficial effect. . . .  We think that these

---

[13] O. E. O. and Legal Services—A Symposium, 14 Catholic Law. 92–174 (1968).

[14] E. Mancuso, The Public Defender System in the State of California 5 (1959).

programs have been beneficial not only to the inmates but to the students, the staff and the courts." [15]

The difficulty with an *ad hoc* program resting on a shifting law school population is that, worthy though it be, it often cannot meet the daily prison demands.[16] In desperation, at least one State has allowed a selected inmate to act as "jailhouse" counsel for the remaining inmates.[17] The service of legal aid, public defenders, and assigned counsel has been spread too thinly to serve prisons adequately.[18] Some federal courts have begun to provide prisons with standardized habeas corpus forms, in the hope that they can be used by laymen.[19] But the prison population has not found that satisfactory.[20]

Where government fails to provide the prison with the legal counsel it demands, the prison generates its own. In a community where illiteracy and mental deficiency is notoriously high, it is not enough to ask the prisoner to be·his own lawyer.[21] Without the assistance of fellow prisoners, some meritorious claims would never see the light of a courtroom. In cases

[15] Barkin, Impact of Changing Law Upon Prison Policy, 47 Prison J. 3, 8 (1969). And see *Matter of Cornell Legal Aid Clinic,* 26 App. Div. 2d 790, 273 N. Y. S. 2d 444.

[16] Wilson, Legal Assistance Project at Leavenworth, 24 Legal Aid Briefcase 254 (1966).

[17] Note, *supra,* n. 5, at 359.

[18] Note, Representation of Indigent Criminal Defendants in the Federal District Courts, 76 Harv. L. Rev. 579 (1963); Note, Representation of Indigents in California—A Field Study of the Public Defender and Assigned Counsel Systems, 13 Stan. L. Rev. 522 (1961).

[19] R. Sokol, A Handbook of Federal Habeas Corpus 53–54, 192–200 (1965).

[20] Larsen, A Prisoner Looks at Writ-Writing, 56 Calif. L. Rev. 343, 353 (1968).

[21] Note, *supra,* n. 5, at 348–349.

where that assistance succeeds, it speaks for itself. And even in cases where it fails, it may provide a necessary medium of expression: [22]

"It is not unusual, then, in a subculture created by the criminal law, wherein prisoners exist as creatures of the law, that they should use the law to try to reclaim their previously enjoyed status in society. The upheavals occurring in the American social structure are reflected within the prison environment. Prisoners, having real or imagined grievances, cannot demonstrate in protest against them. The right peaceably to assemble is denied to them. The only avenue open to prisoners is taking their case to court. Prison writ-writers would compare themselves to the dissenters outside prison . . . .

. . . . . .

"Many writ-writers have said that they would be able to make positive plans for the future if they knew when their [indeterminate] sentences would end. They seem to feel that they are living in a vacuum where their fates are determined arbitrarily rather than by rule of law. One writ-writer very aptly summed up the majority's view with these words: 'When I arrived at the prison and discovered that no one, including the prison officials, knew how long my sentence was, I had to resort to fighting my case to keep my sanity.' . . . Psychologically, the writ-writer, in seeking relief from the courts, is pursuing a course of action which relieves the tensions and anxieties created by the [indeterminate] sentence system." [23]

---

[22] Freund, Remarks, Symposium, Habeas Corpus—Proposals for Reform, 9 Utah L. Rev. 18, 30 (1964).

[23] Larsen, A Prisoner Looks at Writ-Writing, 56 Calif. L. Rev. 343, 347–348 (1968).

In that view, which many share, the preparation of these endless petitions within the prisons is a useful form of therapy. Apart from that, their preparation must never be considered the exclusive prerogative of the lawyer. Laymen—in and out of prison—should be allowed to act as "next friend" to any person in the preparation of any paper or document or claim, so long as he does not hold himself out as practicing law or as being a member of the Bar.

The cooperation and help of laymen, as well as of lawyers, is necessary if the right of "[r]easonable access to the courts"[24] is to be available to the indigents among us.

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACK joins, dissenting.

It is true, as the majority says, that habeas corpus is the Great Writ, and that access through it to the courts cannot be denied simply because a man is indigent or illiterate. It is also true that the illiterate or poorly educated and inexperienced indigent cannot adequately help himself and that unless he secures aid from some other source he is effectively denied the opportunity to present to the courts what may be valid claims for post-conviction relief.

Having in mind these matters, which seem too clear for argument, the Court rules that unless the State provides a reasonably adequate alternative, it may not

---

[24] "Reasonable access to the courts is . . . a right [secured by the Constitution and laws of the United States], being guaranteed as against state action by the due process clause of the fourteenth amendment. In so far as access by state prisoners to federal courts is concerned, this right was recognized in Ex parte Hull, 312 U. S. 546, 549. . . . The right of access by state prisoners to state courts was recognized in White v. Ragen, 324 U. S. 760, 762, n. [1]." *Hatfield* v. *Bailleaux*, 290 F. 2d 632, 636 (C. A. 9th Cir. 1961).

enforce its rule against inmates furnishing help to others in preparing post-conviction petitions. The Court does not say so in so many words, but apparently the extent of the State's duty is not to interfere with indigents seeking advice from other prisoners. It seems to me, however, that unless the help the indigent gets from other inmates is reasonably adequate for the task, he will be as surely and effectively barred from the courts as if he were accorded no help at all. It may be that those who could help effectively refuse to do so because the indigent cannot pay, that there is actually no fellow inmate who is competent to help, or that the realities of prison life leave the indigent to the mercies of those who should not be advising others at all. In this event the problem of the incompetent needing help is only exacerbated as is the difficulty of the courts in dealing with a mounting flow of inadequate and misconceived petitions.

The majority admits that it "is indisputable" that jailhouse lawyers like petitioner "are sometimes a menace to prison discipline and that their petitions are often so unskillful as to be a burden on the courts which receive them." That is putting it mildly. The disciplinary problems are severe, the burden on the courts serious, and the disadvantages to prisoner clients of the jailhouse lawyer are unacceptable.

Although some jailhouse lawyers are no doubt very capable, it is not necessarily the best amateur legal minds which are devoted to jailhouse lawyering. Rather, the most aggressive and domineering personalities may predominate. And it may not be those with the best claims to relief who are served as clients, but those who are weaker and more gullible. Many assert that the aim of the jailhouse lawyer is not the service of truth and justice, but rather self-aggrandizement, profit, and power. According to prison officials, whose expertise in

such matters should be given some consideration, the jailhouse lawyer often succeeds in establishing his own power structure, quite apart from the formal system of warden, guards, and trusties which the prison seeks to maintain. Those whom the jailhouse lawyer serves may come morally under his sway as the one hope of their release, and repay him not only with obedience but with what minor gifts and other favors are available to them. When a client refuses to pay, violence may result, in which the jailhouse lawyer may be aided by his other clients.*

It cannot be expected that the petitions which emerge from such a process will be of the highest quality. Codes of ethics, champerty, and maintenance, frequently have little meaning to the jailhouse lawyer, who solicits business as vigorously as he can. In the petition itself, outright lies may serve the jailhouse lawyer's purpose since by procuring for a prisoner client a short trip out of jail for a hearing on his contentions the petition writer's credibility with the other convicts is improved.

Habeas corpus petitions, as the majority notes, are relatively easy to prepare: they need only set out the facts giving rise to a claim for relief and the judge will apply the law, appointing a lawyer for the prisoner and giving him a hearing when appropriate. This fact does not buttress the unregulated jailhouse lawyer system, but undermines it. To the extent that it is easy to state a claim, any prisoner can do it, and need not submit to the mercies of a jailhouse lawyer. To the extent that it is difficult—

---

*Krause, A Lawyer Looks at Writ-Writing, 56 Calif. L. Rev. 371 (1968); Spector, A Prison Librarian Looks at Writ-Writing, 56 Calif. L. Rev. 365 (1968); Note, Constitutional Law: Prison "No-Assistance" Regulations and the Jailhouse Lawyer, 1968 Duke L. J. 343, 345–347; Note, Legal Services for Prison Inmates, 1967 Wis. L. Rev. 514, 520–522; Note, Prisoner Assistance on Federal Habeas Corpus Petitions, 19 Stan. L. Rev. 887, 891, n. 31 (1967).

and it is necessary to understand what one's rights are before it is possible to set out in a petition the facts which support them—there may be no fellow prisoner adequate to the task. There are some well informed and articulate prisoners and some (not necessarily the same) who give advice and aid out of altruism. When the two qualities are combined in one man, as they sometimes are, he can be a perfectly adequate source of help. But the jails are not characteristically populated with the intelligent or the benign, and capable altruists must be rare indeed. On the other hand, some jailhouse clients are illiterate; and whether illiterate or not, there are others who are unable to prepare their own petitions. They need help, but I doubt that the problem of the indigent convict will be solved by subjecting him to the false hopes, dominance, and inept representation of the average unsupervised jailhouse lawyer.

I cannot say, therefore, that petitioner Johnson, who is a convicted rapist serving a life sentence and whose prison conduct the State has wide discretion in regulating, cannot be disciplined for violating a prison rule against aiding other prisoners in seeking post-conviction relief, particularly when there is no showing that any prisoner in the Tennessee State Penitentiary has been denied access to the courts, that Johnson has confined his services to those who need it, or that Johnson is himself competent to give the advice which he offers. No prisoner testified that Johnson was the only person available who would write out a writ for him or that guards or other prison functionaries would not furnish the necessary help. And it is really the prisoner client's rights, not the jailhouse lawyer's, which are most in need of protection.

If the problem of the indigent and ignorant convict in seeking post-conviction relief is substantial, which I think it is, the better course is not in effect to sanction

and encourage spontaneous jailhouse lawyer systems but to decide the matter directly in the case of a man who himself needs help and in that case to rule that the State must provide access to the courts by ensuring that those who cannot help themselves have reasonably adequate assistance in preparing their post-conviction papers. Ideally, perhaps professional help should be furnished and prisoners encouraged to seek it so that any possible claims receive early and complete examination. But I am inclined to agree with MR. JUSTICE DOUGLAS that it is neither practical nor necessary to require the help of lawyers. As the opinions in this case indicate, the alternatives are various and the burden on the States would not be impossible to discharge. This requirement might even be met by the establishment of a system of regulated trusties of the prison who would advise prisoners of their legal rights. Selection of the jailhouse lawyers by the prison officials for scholarship and character might assure that the inmate client received advice which would actually help him, and regulation of the "practice" by the authorities would reduce the likelihood of coerced fees or blackmail. The same legislative judgment which should be sustained in concluding that the evils of jailhouse lawyering justify its proscription might also support a legislative conclusion that jailhouse lawyering under carefully controlled conditions satisfies the prisoner's constitutional right to help.

Regretfully, therefore, I dissent.