DISCIPLINARY COUNSEL v. COTTON, A.K.A. COTTEN.

[Cite as *Disciplinary Counsel v. Cotton*, 115 Ohio St.3d 113, 2007-Ohio-4481.]

(No. 2004–1130—Submitted February 27, 2007—Decided September 5, 2007.)

———————

O'CONNOR, J.

{¶ 1} This case comes before us upon the finding by the Board on the Unauthorized Practice of Law that respondent Charles D. Cotton, a.k.a. Prince Charles Cotten Sr., engaged in the unauthorized practice of law. For the following reasons, we dismiss the action.

## I. Background

{¶ 2} For more than 20 years, respondent has been an inmate in Ohio's prison system, serving a sentence of 22 years to life on counts of aggravated murder, felonious assault, and forgery. From 1993 through 2005, respondent was incarcerated at London Correctional Institute ("LoCI"). During his time in prison, respondent has acted as a "jailhouse lawyer"[1] by assisting fellow inmates with their legal matters by preparing court pleadings, researching the law, dispensing legal advice, and performing other tasks associated with the practice of law.[2]

{¶ 3} In addition to these actions, respondent also signed the pleadings as follows: "Drafted, Revised And Prepared By PRINCE CHARLES COTTEN, SR. # 146 490, PRO SE ASSISTANCE For THE PLAINTIFF [or relator, petitioner, appellant, etc.] As A STATE AND FEDERAL CONSTITUTIONAL RIGHTS Being Filed Before This MOST HONORABLE COURT In This CASE IN CHIEF [sic]."

{¶ 4} After several warnings to respondent that his actions constituted the unauthorized practice of law, relator, Disciplinary Counsel, filed a complaint with the board on August 19, 2003. On July 13, 2004, the board found that respondent was not licensed to practice law in Ohio. In response to the board's recommendation that we prohibit Cotton from engaging in the unauthorized practice of law, we issued a "show cause" order on July 19, 2004. Following oral argument, we remanded the case to the board in order to determine whether reasonable alternatives exist in Ohio's prison system to assist inmates with the preparation of their legal matters.

{¶ 5} On remand, the board appointed counsel to represent respondent. Appointed counsel conducted discovery, including the taking of depositions, on behalf of respondent.

{¶ 6} Through the discovery process, it was established that LoCI maintains a law library of more than 3,300 legal volumes and eight typewriters for use by the inmates; the library is open seven days a week, six hours each day; there are four inmate law clerks to assist inmates with their legal materials; there are

---

1. Jailhouse lawyers are those inmates who, despite having no formal legal training, assist fellow inmates with their legal matters. *Bourdon v. Loughren* (C.A.2, 2004), 386 F.3d 88, 97, fn. 12.

2. Respondent is not, nor has he ever been, an attorney licensed to practice law in Ohio.

interpreters available to provide assistance; and the library has sample pleadings for inmates to use.

{¶ 7} The board ultimately concluded that respondent had engaged in the unauthorized practice of law and that inmates at LoCI had reasonable alternatives available to access the legal system.

## II. Analysis

{¶ 8} As described above, the legal activities that respondent has undertaken, if performed outside the confines of the prison system, clearly would be considered the unauthorized practice of law and subject to injunction and civil penalties. See Gov.Bar R. VII(2)(A) ("The unauthorized practice of law is the rendering of legal services for another by any person not admitted to practice in Ohio"); see, also, Gov.Bar R. VII(8) and (19)(D)(1). However, because respondent is an inmate, the United States Supreme Court commands that we may curtail his activities only if inmates at LoCI have a reasonable alternative to assistance from jailhouse lawyers. *Johnson v. Avery* (1969), 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718.[3]

{¶ 9} In *Johnson,* the Supreme Court struck down a Tennessee prison regulation that prohibited inmates from "advis[ing], assist[ing] or otherwise contract[ing] to aid another * * * to prepare Writs or other legal matters." Id. at 484, 89 S.Ct. 747, 21 L.Ed.2d 718. The court reasoned that because "it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed, * * * where state regulations applicable to inmates of prison facilities conflict with such rights, the regulations may be invalidated." Id. at 485–486, 89 S.Ct. 747, 21 L.Ed.2d 718.

{¶ 10} The regulation was improper, therefore, because it limited inmates' rights to file habeas corpus petitions by prohibiting assistance from jailhouse lawyers. Id. at 487, 89 S.Ct. 747, 21 L.Ed.2d 718. Tennessee, therefore, could not enforce the regulation unless the state provided reasonable, alternative assistance to inmates in their preparation of legal filings. Id. at 490, 89 S.Ct. 747, 21 L.Ed.2d 718.

{¶ 11} The standard announced in *Johnson* requires that to be considered a "reasonable alternative" to jailhouse lawyers, the assistance provided by the state must accord an inmate with meaningful access to the justice system. *Bounds v.*

---

3.  The requirement in *Johnson* that respondent suffer an injury in fact in order to establish standing to challenge the assistance LoCI provides is inapplicable to this case. Respondent did not bring this suit to press for his own rights to be a jailhouse lawyer. Rather, his challenge is a defense to relator's prosecution of his conduct. Compare *Murr v. Ebin* (May 6, 1997), Franklin App. No. 96APE10–1406, 1997 WL 235160 (inmate's action against prison employees who prevented him from acting as jailhouse lawyer dismissed on basis that inmate demonstrated no actual injury and therefore lacked standing).

*Smith* (1977), 430 U.S. 817, 824, 97 S.Ct. 1491, 52 L.Ed.2d 72. "Meaningful access" requires more than just a law library and four law clerks that have little to no legal training. Cf. *Thaddeus–X v. Blatter* (C.A.6, 1999), 175 F.3d 378, 395–396.

{¶ 12} In this case, respondent has been singled out because (1) the title of "inmate law clerk" has not been bestowed upon him and (2) he signed his name on legal documents. Apparently, the latter is the more deadly sin, as it is what distinguishes respondent from the four law clerks who work at LoCI.

{¶ 13} In drawing this distinction, the board and relator have elevated form over substance. Although the law clerks may have more education than respondent (notably none of this education consists of any specialized legal training), there is nothing to suggest that their education makes them more competent than respondent in their performance of essentially the same tasks.[4] The availability of four law clerks cannot be deemed a reasonable alternative to respondent's assistance as a jailhouse lawyer.

{¶ 14} The reliance on the presence of four clerks to support the conclusion that LoCI's system provides a reasonable alternative is defeated by the fact that LoCI has, as of June 2007, a prison population of 2,153 inmates. See http://www. drc.state.oh.us/Public/loci.htm. In order to be effective in assisting such a large clientele (anywhere from 30 to 200 inmates visit the library each day, and a library assistant estimated that 20 to 80 may be present at the same time), these four clerks must demonstrate more efficiency and productivity than the clerks, paralegals, and office staff of the most high-powered law and governmental offices if they are able to provide meaningful assistance to these inmates in a six-hour timeframe.

{¶ 15} Moreover, of these 2,000–plus inmates, 352 were on waiting lists for LoCI's academic programs from July 2005 through May 2006.[5] See http://www. ciic.state.oh.us/reports/londonci.pdf, at 60. If performance of the activities undertaken by respondent (and other jailhouse lawyers) is restricted to the four law clerks, inmates who are illiterate or who otherwise cannot compose a legal pleading [6] must somehow hope that they can acquire the rudimentary skills and

---

4. Consider that even with their education, the law clerks' own description of their duties reveals that they themselves engage in the unauthorized practice of law.

5. This does not take into account the estimation of one prison official that 90 to 95 percent of inmates at LoCI are illiterate, and approximately 60 to 70 percent of inmates do not have a high school education.

6. Some may argue that we do not allow indigent laypersons to assist other indigent persons with their legal problems, and therefore, we should not allow respondent to assist fellow inmates. The comparison is specious and ignores basic constitutional principles. Indigent criminal defendants,

knowledge necessary to file their own pleadings without the clerks' aid. Assuming that LoCI's program is a reasonable alternative form of assistance, as the dissent would hold, the approach advocated by the dissent presents a problem in that it does not provide for effective enforcement of the sanction. In fact, relator already has shown the futility of attempting to control respondent's activities through numerous letters advising him—to little apparent effect—that he was engaging in the unauthorized practice of law.

{¶ 16} Simply put, there would be no means to enforce any judgment against respondent. Respondent is in the midst of serving a lengthy prison sentence and may never be released on parole. The threat of jail for contempt of court is obviously not a deterrent. Likewise, because respondent has served time for over two decades, monetary sanctions are worthless.

{¶ 17} In addition, there are alternative means of deterring respondent from holding himself out as a lawyer, short of altogether banning him from engaging in the unauthorized practice of law. Even in the absence of reasonable alternatives to the use of jailhouse lawyers, the Supreme Court in *Johnson* explicitly stated that prison officials "may impose reasonable restrictions and restraints" upon jailhouse lawyers, "for example, by limitations on the time and location of such activities." *Johnson*, 393 U.S. at 490, 89 S.Ct. 747, 21 L.Ed.2d 718. Even relator recognizes that the unauthorized practice of law by jailhouse lawyers "can and should be regulated [within the confines of the state's prison system]." The regulation of and enforcement of discipline for respondent's activities, therefore, are best left in the hands of the proper prison authorities.

{¶ 18} Finally, courts often have tools at their disposal to prevent jailhouse lawyers such as respondent from signing inmates' documents without conducting this proposed exercise in futility. In the Supreme Court, S.Ct.Prac.R. VIII(6) enables the clerk to "reject * * * a document tendered for filing unless [it] * * * compl[ies] with the requirements of these rules." Thus, the clerk can reject

---

prior to conviction, have the constitutional right to appointed counsel, but that right does not necessarily extend to postconviction pleadings such as motions for delayed appeals or applications to reopen appeals—the "practice" respondent most frequently engages in on behalf of other inmates. Civil litigants (indigent or not) do not have a "generalized right of counsel in civil litigation. * * * '[C]ertain distinctions can be made between the rights of civil litigants and those of criminal defendants. * * * A criminal defendant faced with a potential loss of his personal liberty has much more at stake than a civil litigant asserting or contesting a claim for damages, and for this reason the law affords greater protection to the criminal defendant's rights.'" *State ex rel. Jenkins v. Stern* (1987), 33 Ohio St.3d 108, 110, 515 N.E.2d 928, quoting *Potashnick v. Port City Constr. Co.* (C.A.5 1980), 609 F.2d 1101, 1118. A concern over the lack of resources available to unrepresented civil litigants is valid, but we fail to understand how the use of state funds to prosecute inmates for the unauthorized practice of law (and undoubtedly ample resources have been expended by the state in this action, which has extended for over three years and which will ultimately fail to be enforceable) helps the plight of poor people who are without counsel in civil cases.

documents signed in contravention of S.Ct.Prac.R. VIII(3) (requiring signatures from the party's attorney or the party itself).

## III. Conclusion

{¶ 19} Today's decision is not so much an endorsement of respondent's "right" to be a jailhouse lawyer as an acknowledgement of inmates' rights to meaningful access to the courts. Because LoCI's prison system does not provide a reasonable alternative to the actions of jailhouse lawyers, we reject the board's recommendations. The charge against respondent is dismissed.

Judgment accordingly.

PFEIFER and O'DONNELL, JJ., concur.

LANZINGER, J., concurs in judgment only.

MOYER, C.J., LUNDBERG STRATTON and CUPP, JJ., dissent.

---

**LANZINGER, J., concurring in judgment only.**

{¶ 20} I concur in the judgment of dismissal, not because London Correctional Institute has failed to meet the standard for reasonable access pursuant to *Johnson v. Avery* (1969), 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718, but because this particular case is not a matter with which the Board on the Unauthorized Practice of Law ("UPL Board") should be concerned.[7]

{¶ 21} The United States Supreme Court in *Johnson* held that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation * * * barring inmates from furnishing such assistance to other prisoners." 393 U.S. at 490, 89 S.Ct. 747, 21 L.Ed.2d 718. Prisoners do not necessarily have to be furnished with both a prison library and assistance with writ writing; "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or* adequate assistance from persons trained in the law." (Emphasis added.) *Bounds v. Smith* (1977), 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72. This rule highlights the fact that to satisfy the *Johnson* standard, "a legal access program need not include any particular element * * *. Any plan, however,

---

7. This is not to suggest that the board should not have proceeded in this matter of first impression. Initially, in 2005, we did not dismiss this case, but remanded it for the board to investigate whether reasonable alternatives exist in Ohio's prison system to assist inmates with the preparation of their legal matters. The work of the board was time-consuming, but necessary to fully present the issues involved.

must be evaluated as a whole to ascertain its compliance with constitutional standards." Id. at 832, 97 S.Ct. 1491, 52 L.Ed.2d 72.

{¶ 22} LoCI has provided a law library with reasonable hours of access, typewriters, sample forms, and inmate law clerks for prisoners. These efforts in providing inmate assistance and access to legal materials are not to be disparaged. Based upon the evidence of record, I would find that the *Johnson* standard has been met so as to allow for regulation of Cotton's activities by the prison authorities.

{¶ 23} Although Cotton is not advertising for "clients" to run a legal practice, nor purporting to represent the relatives of inmates, nor representing individuals in court, as a "writ writer" he is engaging in action that would be considered the unauthorized practice of law if it were done outside of the prison walls. At the very least his behavior is "the preparation of pleadings and other legal documents." *Cleveland Bar Assn. v. CompManagement, Inc.,* 111 Ohio St.3d 444, 2006-Ohio-6108, 857 N.E.2d 95, ¶ 22.

{¶ 24} Gov.Bar R. VII, which prohibits the unauthorized practice of law, provides that "[t]his rule and regulations relating to investigations and proceedings involving complaints of unauthorized practice of law shall be liberally construed *for the protection of the public, the courts, and the legal profession* * * *." (Emphasis added.) Gov.Bar R. VII(17). We have also observed that "the legal system cannot adequately safeguard the public's interest unless it assures a core level of professional competence and integrity." *Disciplinary Counsel v. Kafele,* 108 Ohio St.3d 283, 2006-Ohio-904, 843 N.E.2d 169, ¶ 19.

{¶ 25} However, within the prison universe, where the availability of licensed attorneys is generally nonexistent, the UPL Board's interest in regulating the legal profession is overridden by the need for prison inmates to have help in obtaining access to the courts. The real issue is not whether Cotton's activities as a writ writer should be banned altogether as unauthorized practice of law for the safety of the public, but whether, to the degree that prison administrators deem appropriate, Cotton should be allowed to assist other prisoners. LoCI currently allows other prisoners to act as law clerks, and these inmates have apparently performed services similar to those of Cotton's, except for the signing of motions. As the lead opinion notes, apparently Cotton is an inmate clerk in all but name. Cotton's work as a writ writer is de facto a part of the overall assistance that is available for pro se inmates, assistance which prison authorities themselves are capable of regulating.

{¶ 26} However, any inmate who uses Cotton's help should be aware that while Cotton may assist someone in preparing legal papers, as a nonlawyer he may not file or sign court papers on behalf of anyone else. To avoid the risk of having

filings being considered improper by a clerk of court, an inmate must file court papers in his own name and sign them himself.

{¶ 27} In summary, because I agree that any curtailment of Cotton's activities should be accomplished in the prison setting rather than through a UPL action, I concur in dismissal.

----

LUNDBERG STRATTON, J., dissenting.

{¶ 28} I respectfully dissent from the majority's conclusion that respondent may continue to practice law without a license merely because he is behind prison walls.

{¶ 29} Much of the majority's conclusion is based on two reasons: first, that Ohio prisons provide no reasonable alternative assistance under the standard announced in *Johnson v. Avery* (1969), 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718, and second, that we should not waste our resources prosecuting such cases. I disagree with both premises.

{¶ 30} On remand, the Board on the Unauthorized Practice of Law weighed the evidence and concluded that LoCI met the *Johnson* standard. The majority summarily rejects that finding, largely upon its conclusion that four "inmate law clerks" are insufficient to serve LoCI's inmates. Yet *Johnson* sets no standard requiring the use of inmate law clerks. *Johnson* lays out a more far-reaching standard than the simple issue identified by the majority, and in fact, the *Johnson* standard has been narrowed and clarified by subsequent United States Supreme Court decisions.

{¶ 31} After our remand, Disciplinary Counsel conducted further investigation, including depositions, and presented evidence to a panel of the board. The panel found that LoCI "has implemented a comprehensive system to ensure that inmates are provided adequate access to the courts" and that the relator had adduced "substantial evidence of the services provided to illiterate inmates." Consequently, the panel also found that "[r]easonable alternatives exist in the Ohio prison system and at LoCI to assist inmates in the preparation of petitions for post-conviction relief, and to have access to the courts, as mandated by *Johnson v. Avery* and later U.S. Supreme Court decisions." Thus, the panel concluded that respondent's actions of preparing, assisting, and revising legal papers for other inmates constituted the unauthorized practice of law. The panel recommended that this court issue an order (1) finding that respondent has engaged in the unauthorized practice of law and (2) prohibiting respondent from engaging in the unauthorized practice of law in the future. The panel chose not

to recommend any penalties. The board adopted the panel's findings, conclusions, and recommendation. The majority has now rejected all of those factual findings and recommendations, focusing almost solely on the "four inmate law clerks" as being inadequate to assist other inmates in their legal pursuits.

{¶ 32} The critical case addressing "jailhouse lawyers" is *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718. The issue in *Johnson* was whether a Tennessee prison regulation that prohibited inmates from advising or assisting one another in preparing writs or other legal matters improperly interfered with the inmates' right of access to the courts, particularly the right to file a habeas corpus petition.

{¶ 33} The court found that "it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed." *Johnson,* 393 U.S. at 485, 89 S.Ct. 747, 21 L.Ed.2d 718. The court recognized that inmates generally have no right to counsel when seeking postconviction relief. Id. at 488, 89 S.Ct. 747, 21 L.Ed.2d 718, citing *Barker v. Ohio* (C.A.6, 1964), 330 F.2d 594. For this reason, the court determined, inmates often rely on help from other inmates when filing postconviction petitions. Id. The court found that without the assistance of these jailhouse lawyers, it was possible that valid constitutional claims of illiterate or poorly educated prisoners would never be heard in any court. Id. at 487, 89 S.Ct. 747, 21 L.Ed.2d 718. The court concluded that unless Tennessee provided some substitute assistance to inmates to file their petitions for postconviction relief, the regulation barring the use of jailhouse lawyers could not stand. Id. at 490, 89 S.Ct. 747, 21 L.Ed.2d 718.

{¶ 34} The only alternative assistance that Tennessee provided to inmates was (1) free notarization of pleadings, (2) access to listings of attorneys in the telephone directory, and (3) "on several occasions," access to the public defender at the request of an inmate. *Johnson,* 393 U.S. at 489–490, 89 S.Ct. 747, 21 L.Ed.2d 718. The court in *Johnson* held that these alternatives were "obviously far short" of satisfying the constitutional requirement of providing inmates access to the courts. Banning jailhouse lawyers in effect prevented inmates who were "unable themselves, with reasonable adequacy, to prepare their petitions" challenging the legality of their confinements. Id. at 489, 89 S.Ct. 747, 21 L.Ed.2d 718. Thus, the court held that "unless and until the State provides some reasonable alternative to assist inmates in preparation of petitions for postconviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners." Id. at 490, 89 S.Ct. 747, 21 L.Ed.2d 718.

{¶ 35} The court in *Johnson* did not define "reasonable alternative." However, it is clear that a particular alternative is not sufficient unless it provides inmates with meaningful access to the courts. See *Buise v. Hudkins* (C.A.7, 1978), 584

F.2d 223, 228. "Meaningful access" is further defined by other United States Supreme Court cases.

{¶ 36} The Supreme Court first recognized the right to access to the courts in 1941, when it struck down a state regulation that prohibited prisoners from filing habeas petitions unless they were properly drafted, on the basis that the regulation impaired the petitioner's right to seek habeas relief. *Ex parte Hull* (1941), 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034. More recently, the court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or* adequate assistance from persons trained in the law." (Emphasis added.) *Bounds v. Smith* (1977), 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72. However, there is no one constitutionally acceptable method to ensure meaningful access to the courts. Id. at 830, 97 S.Ct. 1491, 52 L.Ed.2d 72. Particular remedies, such as the law library in *Bounds,* are "not the ends in themselves, but only the means" of ensuring such access. *Lewis v. Casey* (1996), 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606.

{¶ 37} In *Lewis,* decided 27 years after *Johnson,* the court recognized some limitations on the right of access to the courts. The court in *Lewis* determined that in order to assert a claim alleging denial of the right of access, an inmate must prove actual injury; merely showing that a law library or legal assistance program "is subpar in some theoretical sense" is not enough. Id. at 351, 116 S.Ct. 2174, 135 L.Ed.2d 606.

{¶ 38} The court in *Lewis* also determined that meaningful access does not require a state to provide inmates the means to "*discover* grievances" or to "*litigate effectively.*" (Emphasis sic.) Id., 518 U.S. at 354, 116 S.Ct. 2174, 135 L.Ed.2d 606; see also *Cody v. Weber* (C.A.8, 2001), 256 F.3d 764, 767–768. The court stated that "[t]o demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is effectively to demand permanent provision of counsel, which we do not believe the Constitution requires." *Lewis* at 354, 116 S.Ct. 2174, 135 L.Ed.2d 606.

{¶ 39} The court in *Lewis* further determined that "the Constitution does not require that prisoners (literate or illiterate) be able to conduct generalized research, but only that they be able to present their grievances to the courts—a more limited capability that can be produced by a much more limited degree of legal assistance." Id., 518 U.S. at 360, 116 S.Ct. 2174, 135 L.Ed.2d 606.

{¶ 40} Thus, the court in *Lewis* concluded that "meaningful access" means only that inmates "have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." Id. at 356, 116 S.Ct. 2174, 135 L.Ed.2d 606.

{¶ 41} I believe that *Lewis* limits the scope of the alternative assistance required under *Johnson*, by holding that alternative assistance requires a state to provide inmates a reasonably adequate opportunity to file claims challenging their convictions or conditions of confinement, but does not require the state to provide inmates the effective equivalent of legal counsel.

{¶ 42} Respondent's conduct is not identical to that of the inmate clerks except for "signing pleadings" as the majority contends. The board found that "[a]lthough Respondent's conduct appears to encompass certain activities in which the inmate legal assistants also engage (properly or otherwise), Respondent's conduct exceeds that level of participation and control." Respondent assisted other inmates by drafting, conducting legal research, and providing legal advice. None of the inmate clerks ever signed another inmate's pleading, nor did any insert a statement in another inmate's pleading indicating that the clerk had drafted it. It is this conduct that alerted relator to investigate respondent.

{¶ 43} Moreover, whether the inmate clerks are assisting other inmates in a manner that constitutes the unauthorized practice of law is not currently before this court. Respondent's conduct is the sole subject of today's decision.

{¶ 44} The majority summarizes the measures adopted by LoCI and Ohio's prisons in a simplistic manner. In greater detail, the state of Ohio has adopted measures to ensure that inmates receive access to legal services, which include (1) providing inmates who are not in the general population access to legal materials, (2) establishing a library's schedule of operation, (3) permitting inmates to purchase law books, (4) permitting inmates to assist each other in preparing legal documents, (5) permitting inmates access to typewriters and assistance in typing, (6) permitting inmates to contact attorneys, and (7) providing inmates legal kits. See Ohio Adm.Code 5120–9–20(B). In addition, the Department of Rehabilitation and Correction has adopted a policy to ensure that inmates have adequate access to the courts, attorneys, and legal-research materials. Specifically it provides (1) that each prison library must maintain current editions of the required legal materials, (2) that each library must have reasonable hours, (3) that each library may employ inmate clerks, (4) that inmates may request assistance from a staff member, (5) that illiterate inmates may request assistance with their initial pleadings (reading and writing), (6) that inmates may have access to a translator if necessary, (7) that inmates must be instructed in writing and orally how they may acquire assistance, (8) that provisions must be made for indigent inmates, (9) that inmates may possess legal materials, (10) that inmates may assist each other in "the preparation and filing of legal documents or other legal matters" with reasonable restrictions, and (11) that inmates may not hold themselves out as being attorneys. DRC Policy 204–01, as effective November 28, 2000.

{¶ 45} Both of these provisions permit inmates to assist one another in preparing legal documents. Ohio Adm.Code 5120–9–20(B)(5); DRC Policy 204–01, Section VI(F)(1). However, the policy precludes inmates from holding themselves out as attorneys. Id. at VI(F)(4). Furthermore, although *Johnson* precludes a state from regulating jailhouse lawyers unless the state provides inmates an adequate alternative type of assistance, *Johnson* does not confer on an inmate a license to practice law. *Webb v. State* (1980), 274 Ind. 540, 542, 412 N.E.2d 790. And under *Lewis,* the right of access to the courts does not require that a state provide inmate assistance that is equivalent to legal counsel. Id., 518 U.S. at 354, 116 S.Ct. 2174, 135 L.Ed.2d 606. Thus, I agree with the board that the authorized activities of the inmate clerks are mostly clerical in nature, such as directing inmates to the location of texts and showing inmates how to use the various law books and legal forms. Inmate clerks are not authorized to give legal advice, draft a legal pleading for another inmate, recommend strategy, make legal arguments, or otherwise act as an attorney.

{¶ 46} Consistent with the aforementioned policies, LoCI has a law library that contains over 3,300 volumes and is staffed by a librarian, assistant librarian, and four inmate law clerks. The library is open seven days a week, six hours a day. The library maintains on file 30 to 40 fill-in-the-blank legal forms, which include forms for a notice of appeal, habeas corpus, civil rights violations under Section 1983, an affidavit of indigency, a motion to reduce fines, and a motion for jail-time credit. Inmates also have access to translators, typewriters, and legal kits, which contain writing materials. LoCI does not charge indigent inmates for mailing court filings. And LoCI provides indigent inmates with a legal kit free of charge.

{¶ 47} Most important, LoCI has procedures in place to assist illiterate or uneducated inmates. LoCI requires all incoming inmates to be evaluated. Illiterate inmates are required to attend instruction. There is a special intensive literacy dormitory with tutors and assistance available around the clock for inmates at the extreme low end of the literacy scale.

{¶ 48} Inmates are also informed, both in writing and orally, of the literacy program, as well as the availability of assistance from staff members or inmate law clerks. The inmate clerks help illiterate inmates to read books, cases, pleadings, and the like. Inmate clerks assist other inmates in writing or typing their pleadings using words generated by the inmate. Inmate law clerks also help inmates locate the fill-in-the-blank form on file in the library that corresponds to the inmate's particular claim. If the library does not have the form that an inmate is looking for, the library staff may call the public defender's office to acquire it. The public defender updates the library with new forms.

{¶ 49} I would find that the assistance provided by LoCI provides inmates with "a reasonably adequate opportunity to file nonfrivolous legal claims challenging

their convictions or conditions of confinement." *Lewis,* 518 U.S. at 356, 116 S.Ct. 2174, 135 L.Ed.2d 606. The educational opportunities, coupled with access to a law library, assistance with reading and writing, and rudimentary advice regarding legal matters, e.g., locating a fill-in-the-blank legal form, suggesting a particular word, or directing an inmate to a particular legal source are sufficient to afford illiterate and uneducated inmates that opportunity.

{¶ 50} Inmates deserve the same protection from untrained, unqualified persons who act as lawyers dispensing legal advice that we afford to the public. *Cleveland Bar Assn. v. CompManagement, Inc.,* 111 Ohio St.3d 444, 2006-Ohio-6108, 857 N.E.2d 95, ¶ 23. As Justice Byron White stated in his dissent in *Johnson,* "[m]any assert that the aim of the jailhouse lawyer is not the service of truth and justice, but rather self-aggrandizement, profit, and power." Id., 393 U.S. at 499, 89 S.Ct. 747, 21 L.Ed.2d 718 (White, J., dissenting). And it's unlikely that "the problem of the indigent convict will be solved by subjecting him to the false hopes, dominance, and inept representation of the average unsupervised jailhouse lawyer." Id. at 501, 89 S.Ct. 747, 21 L.Ed.2d 718. "Unless the help the indigent gets from other inmates is reasonably adequate for the task, he will be as surely and effectively barred from the courts as if he were accorded no help at all." Id. at 499, 89 S.Ct. 747, 21 L.Ed.2d 718. By washing our hands of policing the actual practice of law by jailhouse lawyers, we increase the danger that an inmate will receive incompetent legal advice that could damage his of her chances on appeal, or worse.

{¶ 51} Here respondent drafted legal pleadings, conducted legal research, and gave legal advice to inmates, all without any legal training or education. Respondent also either signed pleadings and motions on behalf of other inmates or inserted a statement acknowledging that he had drafted them. Respondent is neither an attorney nor a party in any of the pleadings that are at issue. Yet our decision will continue to allow other inmates to engage in such activities despite the board's conclusion that LoCI provides inmates reasonable alternative assistance that complies with *Johnson.*

{¶ 52} I do not believe that this is a "prison regulation" issue only. Our authority, and obligation, to regulate the practice of law does not stop at the prison door. We have the same duty to protect other inmates from incompetent and ineffective lawyering. Instead, we allow such conduct to continue unabated by this decision. Thus, I respectfully dissent and would find that respondent engaged in the unauthorized practice of law.

———————

Cupp, J., dissenting.

{¶ 53} I respectfully dissent. I would adopt the findings and conclusions of the Board on the Unauthorized Practice of Law. The board found that Cotton engaged in the unauthorized practice of law by preparing legal papers on behalf of other inmates. The board also found that Cotton signed or placed his name on some pleadings as if he were acting as legal counsel for the other inmates.

{¶ 54} I would adopt the board's recommendation to enjoin Cotton from engaging in the unauthorized practice of law in the future. Additionally, I would encourage the officials of the Ohio Department of Rehabilitation and Correction to enforce their rules prohibiting inmates from acting or holding themselves out as attorneys on behalf of other inmates to avoid the unauthorized practice of law within the prison system.

MOYER, C.J., concurs in the foregoing opinion.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Robert R. Berger, Assistant Disciplinary Counsel, for relator.

Jones Day, Shawn J. Organ, and Kerstin Elisabet Sjoberg–Witt, for respondent.